GULF REFINING Co. *et al. v.* TRAVIS.

(In Banc. Jan. 27, 1947. Suggestion of Error Overruled May 5, 1947.)

[29 So. (2d) 100. No. 36281.]

[30 So. (2d) 398.

338

Green & Green, Irwin W. Coleman, and C. C. Richmond, all of Jackson, Welch, Cooper & Welch, of Laurel, Wilbourn, Miller & Wilbourn, of Meridian, and John E. Green, Jr., of Houston, Tex., for appellant.

340

**Watkins & Eager** and **Lotterhos, Travis & Dunn,** all of Jackson, **Lloyd Spivey,** of Canton, and **Robert G. Gillespie,** of Meridian, for appellee.

344

**Welch, Cooper & Welch,** of Laurel, for appellants, the "Cox group" and the "Perkins group."

348

Green & Green, of Jackson, for appellants, the Ridgway group.

**J. R. Buchanan,** of Laurel, amicus curiae, for appellee,

Green & Green, Irwin W. Coleman and C. C. Richmond, all of Jackson, Welch, Cooper & Welch, of Laurel, Wilbourn, Miller & Wilbourn, of Meridian, and John E. Green, Jr., of Houston, Tex., for appellants, Gulf Refining Company, on suggestion of error.

**Griffith, J.,** delivered the opinion of the court.

The tract of land here involved, consisting of approximately one hundred acres, is situated in or near the Heidelberg Oil Field in Jasper County. The discovery well in that field was brought in during the month of December, 1943.

On June 14, 1932, the land was owned by G. B. Travis, the common source of title. On that date he conveyed it to his daughter, Mrs. J. H. Hooks, for a valuable consideration paid but Mrs. Hooks, as so many thousands of others have done in the past and will doubtless continue to do in the future, failed to promptly put her deed of record, and did not file it for record until April 13, 1942.

Mrs. Hooks then lived in a different part of the State, and later moved to Louisiana. She made arrangement with her father, who lived in Heidelberg about three miles from the land, that he would look after it, and the tenants thereon would pay the taxes, and the like. For convenience Mr. Travis allowed the land to be continued to be assessed to him along with two other tracts owned by him or his wife. He had no authority, however, as it is now shown, to make any lease on the land other than

the ordinary agriculture lease, and none to convey away any other interest.

Although without authority to do so, G. B. Travis, on April 24, 1933, made a mineral deed on this land, including also the two other tracts owned by him or his wife to Frederick G. Cook, Trustee. Later and on October 21, 1937, he made a mineral lease on the same three tracts to Gulf Refining Company, and on the next day a mineral deed to C. R. Ridgway. These three instruments were promptly recorded, and it is under one or the other of them that all appellants herein claim.

When the said mineral deed was made on April 24, 1933, a substantial part of the hundred acres here involved was in the actual possession of a tenant who was put there after consultation with Mrs. Hooks about the particular tenant. This tenant had begun his plowing on the land for the 1933 crop in February of that year, and he was well aware of the fact that Mrs. Hooks, and not Mr. Travis, owned the land. This tenant had not been on the land during its ownership by Mr. Travis. Mrs. Hooks was in the actual occupancy of the land by her tenants when the mineral lease and the mineral deeds were made by Mr. Travis in 1937, and these tenants also knew that Mrs. Hooks and not Mr. Travis was the owner. An inquiry of the tenants in possession at the dates mentioned in this paragraph would have disclosed her ownership to any prospective purchaser.

But the persons or agents who procured the mineral deeds and leases aforementioned did not go to the land or upon it, nor did they send any person to do so. No information about it otherwise was obtained by them. They had, therefore, no actual knowledge of the occupancy of Mrs. Hooks by her tenants. They made no search of the public records other than the assessment roll; and seeing that the tract was assessed to G. B. Travis, they dealt with him on the assumption that he was the owner.

In 1940 G. B. Travis and his wife became invalids, and to a large extent helpless. Two of their sons lived in Jack-

son, and in 1942 they brought their invalid parents to Jackson in order to better attend to their needs. One of these sons is the appellee, and the other is Cecil Travis, prominent at the bar of the State. Mrs. Hooks desired to share in the expense and to that end she conveyed this land to her brother, J. A. Travis, the appellee here, this deed being of date January 4, 1943, recorded June 9, 1943. Mrs. Hooks knew nothing of the mineral leases and deeds made by her father until a short time before the institution of this suit to cancel them as clouds upon the true title, and, as stated, she had not authorized her father to make them.

The salient facts above stated are either undisputed or else are shown by evidence sufficient to support the finding upon the facts in favor of appellee by the chancellor. They present the first contention earnestly pressed by appellants, that it is immaterial whether Mrs. Hooks was in actual possession of the land by her tenants at the time appellants acquired their mineral leases and mineral deeds aforestated, because, as appellants contend, the registration statutes as amended by Chap. 239, Laws 1924, Sections 2146, 2147 and 2148, Code 1930, same sections 867, 868, 869, Code 1942, give priority in title to the holder who first files his deed for record in the absence of actual notice to him.

For a century, beginning as far back as Dixon v. Doe ex dem. Lacoste, 1 Smedes & M. 70, and through a uniform line of decisions on down to Beauchamp v. McLauchlin, 200 Miss. 83, 25 So. (2d) 771, decided in 1946, it has been consistently held that the registration statutes do not affect an owner in possession by himself or by his tenants, and that his actual possession is all the notice necessary to any prospective purchaser.

On February 4, 1924, the case of Craig v. Osborn, 134 Miss. 323, 98 So. 598, was decided. It was erroneously interpreted as holding that the registration of a deed under the statutes as they then read took effect from the time of its actual recording, and not from the time it was

filed. The legislature was then in session and on April 9, 1924, the amendatory act now under consideration was approved, Chap. 239, Laws 1924, which expressly clarified the rule, so that the deed first actually filed for record would take priority, and not the time of the recording, in the absence of actual notice. This was the only purpose of the Act, and it properly excepted from its operation that a deed first filed would not take priority over a deed of an earlier date when the person first filing had actual notice of the earlier deed. This was the only issue before the legislature, namely, that which was dealt with in Craig v. Osborn, and there was no thought or purpose to interfere in any way whatever with the established rule with reference to the effect of actual possession of the land.

If we were to sustain the contention now made by appellants on this point, we would open up one of the most profitable fields for legalized plunder that could well be imagined. Millions of acres of improved lands in this State are held by owners who cannot trace their title by unbroken chain back to the government, and hundreds of thousands of these acres, even to highly improved city lots, are held by owners who have not been in actual adverse possession for as much as ten years. Under appellants' contention, searchers of records in the recorders' offices throughout the State could find the innumerable instances where there is a break in the recorded chains, and being careful not to seek or receive any information about the possession of the land, could go to the last person in the chain of record title up to the time it was broken, or to his heirs and obtain from him or them a deed which he would promptly record and thereupon through such means could evict from their homes and farms and shops every owner thereof who had not been in actual possession for as much as ten years. Case upon case is to be found in our decisions to the effect that we are not obliged to act upon literalness in legislative language when so to do would make it embrace that which

the legislature could scarcely have had in mind and which would produce grossly unjust and impolitic results.

Moreover, there have been a number of cases before this Court in the twenty-two years since the passage of Chapter 239, Laws 1924, wherein the stated rule as to the effect of actual possession has been continued to be maintained. One of these is Kalmia Realty & Ins. Co. v. Hardy, 164 Miss. 313, 145 So. 506, 507, wherein it was suggested that the rule previously maintained as to the effect of actual possession as notice should be modified, and the Court responded that "No hardship can result from refusing to modify the rule and continuing to hold persons who desire to purchase or obtain liens on property to the necessity of ascertaining whether or not it is in the possession of a person other than its owner; and, if so, what the title of the possessor is, and, if he claims under another, what the title of such other is." And this case was followed as late as Beauchamp v. McLauchlin, supra, in 1946. And to the argument that the amended Act of 1924 was not called to the attention of the court in any of these several cases, we reply with the quotation taken from the opinion in Gabriel v. Brame, 200 Miss. 767, 28 So. (2d) 581, 583, decided by us two weeks ago, that "'Where there has been a long series of uniform decisions asserting the same principle and reaching the same conclusion upon facts which are alike and where a point now lately made was as much involved, the fact that the point has not been raised in any of these cases by counsel or stated by the court is strong support that it is now made without ground."

The twenty-two years since the amendatory Act was passed, and during all which time the decisions have proceeded to maintain the same rule in relation to possession as before its passage, have been by far the most active in the entire history of the State in the transfers of title. Thousands upon thousands of such transfers have taken place in that twenty-two years on the faith of those deci-

sions, and upon obvious principles of public policy they must now stand.

Appellant, Gulf Refining Company, invokes against appellee the doctrines of equitable estoppel and ratification based upon the facts briefly outlined in the two paragraphs next following. The doctrine of estoppel is not available for several reasons, and we mention one of them only as being sufficient within itself to dispose of that contention. It plainly appears that the Refining Company and those, if any, claiming under it did nothing whatever in altering its or their position to its or their prejudice in reliance upon the acts of appellee, other than to pay the small sums in renewal, and this can be fully rectified by the repayment thereof with interest, which appellee offered to do. Estoppel operates only in favor of one who induced by the acts or representations of another so changes his situation that injury would result if the truth were known. Garmon v. Fitzgerald, 168 Miss. 532, 540, 151 So. 726, quoting from Hart v. Livermore Foundry & Machine Co., 72 Miss. 809, 830, 17 So. 769— to cite one among many to the same effect.

The mineral lease to the Gulf Refining Company, made by G. B. Travis on October 21, 1937, contained provisions for its annual renewal through a period of ten years by the payment on or before October 21st of each year of an annual rental, commonly called delay rentals, of approximately twenty-five cents an acre. These payments were made by voucher checks, payable to G. B. Travis and wife, through a designated bank in Jasper County. After appellee's parents became seriously ill in 1940 as heretofore mentioned, the affliction of the father being such as to disqualify him mentally, the bank sent notice of these voucher checks to appellee, who endorsed them in the name of his father and mother, and used the proceeds in aid of their care. This was done for the years 1940 to and including 1944. These voucher checks each stated that they were in payment of annual rental on lease made by G. B. Travis and wife on October 21, 1937 on 270 acres in

two different sections of land, naming the sections but not the descriptions within the sections.

And on March 20, 1944 Mr. Eugene Seale, an attorney for the Gulf Refining Company, wrote a letter to appellee describing the particular land in controversy in this case, stating that it was covered by lease to the Refining Company executed by Mr. and Mrs. G. B. Travis, but not stating when the lease was executed, and asking questions about corrections to be made in the title to an adjoining forty acres. Appellee says, and this is undisputed, that he made no inquiry into any of these matters and paid no attention in detail to the recitals of the bank notices and the voucher checks, and that as to the letter from Mr. Seale, he turned that over to his lawyer brother for attention, without himself reading it further than to observe that it was a matter in his estimation for the consideration of a lawyer rather than for the attempt at understanding by a layman. Upon the reference of the letter to his lawyer brother, the latter informed him that an abstract on the property would be obtained as soon as possible, and that thereupon the lawyer would report to him upon the matter. It turned out that the congested conditions at the county courthouse, owing to the unprecedented activity there brought about by the recent discovery of oil in the county, were such that the abstract could not be and was not obtained until December 1944, and after the annual rental due on October 21, 1944, had been collected by appellee.

We think it is not of controlling consequence whether or not appellee read the documents and the letter above mentioned, for, if he had done so, none of them would have furnished him any information on the following two facts not only of material, but of dominant, importance: First, as to when it was that G. B. Travis conveyed the land to his daughter, Mrs. Hooks; and of more importance, second, whether Mr. Travis had been authorized by his daughter to execute the lease in her behalf. The record definitely supports the finding of the chancellor

that appellee had no knowledge whatever of the matter last above mentioned until receipt of the abstract in December 1944, and upon inquiry then made whether the authority mentioned existed, when for the first time he learned that there had been no such authority, and when, as heretofore stated, for the first time Mrs. Hooks was informed that there had been any such leases. Up to that time appellee, as the son of his father, was entitled to assume either that the lease was made while G. B. Travis still owned the land, or else that it was made on the authority of his daughter, the owner.

It may be admitted for the purposes of this case that the information carried by the documents mentioned was sufficient to put appellee on inquiry, which, if diligently pursued by him here and there, would have led him to full knowledge, and thus the question is squarely presented whether notice was all that was necessary to bind him as by ratification or whether knowledge as such, full and complete, was required.

It is a principle which pervades the decisions by the great weight everywhere that when a person is sought to be charged by way of ratification, it must be shown that he had full and complete knowledge of all the material facts, and a familiar expression used in that connection is that the proof must show that such full knowledge has been brought home to him, and it is not enough that he has information which, if pursued by him, would have led him to full and complete knowledge.

The classical text upon and around which the body of law on Agency has been built, Story on Agency, explains the particular point in hand in this language: "The principal, before a ratification becomes effectual against him, must be shown to have had previous knowledge of all the facts and circumstances in the case, and if he assented to or confirmed the act of his agent while in ignorance of all the circumstances, he can afterwards, when informed thereof, disaffirm it. And the principal's want of such knowledge, even if it arises from his own

carelessness in inquiring or neglect in ascertaining facts, or from other causes, will render such ratification invalid. His knowledge is an essential element." Story on Agency, Sec. 231, note 1. That statement by Story is found again in the 8th Edition, Sec. 253, note 1, and this is cited with approval by Campbell, J., in Meyer v. Baldwin, 52 Miss. 263, at page 271.

Quoting this statement by Story, the Supreme Court of Alabama, in Brown v. Bamberger et al., 110 Ala. 342, 355, 20 So. 114, 118, said further upon the point: "The doctrine of constructive knowledge, or imputation of knowledge from mere notice, does not obtain in this connection. It is what the party sought to be charged knows, and not what he has mere legal notice of, that is to be considered in determining whether there has been a ratification. He is charged on full knowledge, and not because be ought to have known but did not,— not because he had notice which should have incited him to an inquiry which, if properly prosecuted, would have brought knowledge."

Cases in great number to this effect are collected in 36 Words and Phrases, Perm. Ed., pp. 132 to 136, and see 2 Am. Jur., Agency, Sec. 224, and the wealth of cases cited in the notes to that section. An interesting case, by one of our ablest courts, and closely in point here, is Kidder v. Greenman, 283 Mass. 601, 187 N. E. 42, 88 A. L. R. 1370, which may be read with profit.

We must forbear to extend this opinion, already lengthy, by a further review of the authorities which support what we are holding herein and will say only that when appellee did obtain full and complete information, he promptly filed his bill to cancel the unauthorized leases; and this in itself is enough to distinguish this case from Koenig v. Calcote, 199 Miss. 435, 25 So. (2d) 763, so confidently relied on by appellant, besides which that case was not one involving ratification but was a suit to rescind and cancel a lease made by the party complainant himself.

There is an exception to the rule as stated in the three preceding paragraphs, but the exception is not here involved. And there are a few cases, some of which are cited and relied on by appellant, which hold that where a reasonably prudent man would naturally have been excited to inquiry and the full facts are immediately and conveniently at hand, he will be held to have known them; but we must decline to follow any such minority rule, not alone because it is so far in the minority but because also it would be capable of dangerous uses, unsuited to a sound administration in the practical affairs of life.

We will add, however, an observation touching the argument made in behalf of appellant, Gulf Refining Company, that a man with appellee's education and experience, and with his more than average general intelligence, ought to be held, especially after the letter to him by Seale, to have known enough of the essential facts to charge him, as a man of sense, with what amounted to a ratification in his acceptance in October 1944 of the annual rental, to which it is enough to reply that if he did know enough of the facts and if by the acceptance of the trifling sum of twenty-three dollars on this land, well within the newly discovered oil field, he intended at that time to ratify this unauthorized lease, he would be made out, not as having any sense, but as being little if any better than a moron. We are of the opinion that the chancellor was correct in holding that there was no ratification.

We have examined the other errors assigned and argued, but we are of the opinion that they are not sufficient to require a reversal of the decree.

Affirmed.

**McGehee, J.**, being a close kinsman of some of the appellants, took no part in this decision.

**Roberds., J.,** delivered a partially concurring and partially dissenting opinion.

I concur in the construction given Sections 867, 868 and 869, Code of 1942, in the main opinion. I also adhere to the rule of notice of the rights of an owner by his actual or constructive possession. I have grave doubts, however, whether the rule is applicable to the facts of this case. When the lease and the various conveyances were executed by G. B. Travis the property was assessed to him on the tax rolls, and he was ostensibly managing it and controlling it just as was the case before he executed his deed to Mrs. Hooks June 14, 1932. If inquiry had been made of the tenants some would have said G. B. Travis was the owner, and others would have said Mrs. Hooks was the owner, if their respective statements had been in accord with their testimony. But I am concurring in the majority holding that the rule of notice is here applicable, because, and only because, the deed records did not show that G. B. Travis was the owner of the property. He got a deed from McIntosh, Trustee, January 27th, 1932. He placed the deed of record. It was destroyed by fire when the courthouse burned September 10, 1932. His deed was not re-recorded until June 13, 1944, after he had executed the lease and various mineral deeds involved in this case. Prior to the time G. B. Travis got his deed and even prior to 1929 the land had been owned by Webb Newell. Newell's deed was also destroyed by the fire. Therefore, when the various conveyances were executed by G. B. Travis, beginning October 16, 1933, and continuing to October 14, 1938, there was no deed record in Jasper County showing who was the owner of the land. In other words, one desiring to purchase or procure a lease on the property would not have been misled by examination of the records as to who was the owner. The only recorded indication of ownership in G. B. Travis was the fact the land was assessed to him on the rolls. Looking at the situation from a common sense standpoint a prospective purchaser,

not having found on the record any deed to anyone, was charged with the duty, as an ordinarily prudent man, to make a more thorough outside investigation as to who was the true owner than would have been the case had there been a deed on record to G. B. Travis. In other words, the deed records gave no actual or apparent notice that G. B. Travis had title, an examination of such records would not have misled the examiner. No one was induced to purchase by anything which appeared on the records. There were no records. See Dixon v. Doe ex dem. Lacoste, 1 Smedes & M. 70; Richter, Phillips Co. v. Phillips, 175 Miss. 242, 166 So. 393. That, to my mind, is the decisive fact in this question and should distinquish this case from any other which might hereafter arise not containing that important fact.

But I can not agree that J. A. Travis did not ratify the Gulf lease. Clearly to my mind he did ratify it. It is conceded that the only reason alleged to explain why he did not ratify it is the claim that he did not realize that the Gulf lease covered the same land which his sister, Mrs. Hooks, conveyed to him January 4, 1943. These are the pertinent facts bearing upon that question: The land in controversy consists of 104 acres and is located in the Northwest Quarter of Section 5, Township 10, Range 10 West. On and before January 8, 1929, said land was owned by Webb Newell. Before that date he had executed a deed of trust thereon to the Federal Land Bank, the installment payments thereunder to run over a number of years. On and before said date Mr. G. B. Travis and his son, J. A. Travis, owned and operated a mercantile business under the style of Travis & Son, located in Heidelberg, Jasper County. On that date Newell executed a deed of trust on said land in favor of Travis & Son to secure $338.26 due September 1, 1929. Travis & Son assigned this deed of trust to Threefoot Brothers. October 31, 1931, the deed of trust was foreclosed and the land was purchased in the name of G. B. Travis, who executed his note to Threefoot Brothers for

$287.89, the balance of the debt owing by Travis & Son to Threefoot. June 14, 1932, G. B. Travis conveyed the land to Mrs. J. H. Hooks. That deed was not filed for record until April 13, 1943. In the meantime, and beginning April 24, 1933, and ending October 7, 1938, Mr. G. B. Travis had executed two mineral leases and four mineral deeds on the land. These were all duly placed of record. This included the lease to Gulf dated October 21, 1937, which was recorded November 12, 1937.

In 1940 Mr. G. B. Travis became disabled to attend to business matters and Mr. J. A. Travis took charge of the land. Up to that time Mr. G. B. Travis had managed and looked after the property, collected all of the renewals under the lease, paid the taxes and installments to the Federal Land Bank. The Gulf lease contained 270 acres. That consisted of the Newell tract owned by Mrs. Hooks, and an 84 acre tract known as the McDonald tract adjoining and lying immediately east of the Newell tract, title to which was in Mrs. G. B. Travis, and also what is known as the Cook tract consisting of 80 acres located some 5 or 6 miles from the other two tracts. However, Mr. G. B. Travis had already conveyed away the Cook tract when appellant took charge. That was done April 30, 1939, so that the Gulf Company was paying to Travis rent upon the Newell and McDonald tracts alone. These two tracts were located some 6 or 7 miles from Heidelberg where J. A. Travis lived. As stated, they join. Mr. J. A. Travis looked after these two tracts. The tract in controversy was known in the community as the Newell place. September 26, 1941, the Gulf paid renewal rental of $33.75 under its lease. The check was payable to the order of G. B. Travis and Ida Travis. It covered renewals on the McDonald and Newell tracts. Mr. J. A. Travis endorsed this check in the name of his father and mother. The check was accompanied by a receipt which gave the name of the lessors, the date of the lease, and the date of its expiration and the amount of rental, and stated that a part of the land was located in Section 5, Township 10, Range 10,

Jasper County. J. A. Travis signed the names of his father and mother to that receipt, which receipt said: "Received the above amount of money, being full payment for the purpose and for the period and under the terms of said instrument mentioned above." The same thing happened September 28, 1942, and September 29, 1943. J. A. Travis deposited these three rental checks to his own credit or collected the money thereon. On March 20, 1944, Mr. Eugene Seale, an attorney at Meridian, Mississippi, employed by the Gulf Company in title work, wrote a letter to Mr. J. A. Travis, which he received. That letter described the land in controversy, gave the section, township and range, said it was covered by the Gulf lease executed by Mr. and Mrs. G. B. Travis, and that the record showed that J. A. Travis was the owner at that time, Mrs. Hooks having executed a deed to him January 4, 1943. The letter refers to this land having been acquired by G. B. Travis from Webb Newell "although there is no deed of record from Webb Newell." It refers to the trust deed executed by Newell to the Federal Land Bank many years before. The letter contained a plat of the land in controversy with the words "Webb Newell" written over that tract on the plat. The letter sought information as to whether the Federal Land Bank had been paid, and some other information desired by said attorney. Mr. J. A. Travis delivered this letter to his brother. But no reply was made thereto. Not having had a reply to this letter, Mr. S. R. Nettles, an attorney doing curative work for the Gulf Company, called on Mr. J. A. Travis and his brother in June 1944 and discussed the matter with them. Notwithstanding receipt of this letter and all of the other events which happened prior thereto, Mr. J. A. Travis received a check from the Gulf Company dated September 28, 1944, for renewal rent on the land in controversy. The McDonald 84 acres had been sold and this check covered only the rent on the Newell tract. Mr. J. A. Travis endorsed the name of his father and mother on that check and he

signed a receipt in their names for the money. In the meantime J. A. Travis, in March 1942, had moved to Jackson, and on October 23, 1942, he wrote the Gulf Company a letter as follows:

"G. B. Travis and Ida Travis are my parents. Both are physically (not mentally) afflicted due to strokes in right arm and leg. I have moved them here as a matter of convenience.

"Kindly change their address to 935 Morningside St., Jackson, Miss. Also, it would be more convenient for them if you could clear rental payments through the Deposit Guaranty Bank and Trust Co., Jackson, Miss."

The Company promptly acknowledged receipt of that letter saying it could not change the depository because there were many people interested in the minerals who would have to consent to the change of the depository. However, the change of address was noted. After this letter was written, Mr. J. A. Travis received, endorsed, and collected three rental checks under the lease on the land in question.

Under these circumstances how can it be said that Mr. Travis did not know the Gulf lease covered his land? Can one close his eyes and say he did not see the obvious? Mr. Travis had admitted that he knew of the deed from his father to Mrs. Hooks June 14, 1932, conveying the land in question. He got his deed almost eleven years thereafter. He was then charged with the notice that this lease was on record, executed by his father to the Gulf Company. He was a member of the partnership firm to whom Webb Newell owed the original debt. Until he moved to Jackson in 1942, he lived within a few miles of this land, and from the time his father became disabled to the time of the trial he had managed and looked after it, and since he got his deed, January 4, 1943, he had done that as owner.

This is not a case of principal and agent. It is a question of estoppel and ratification. In Merchants & Manufacturers Bank et al. v. State, 200 Miss. 291, 25 So. (2d)

585, 591, this Court said: ". . . Then, too, the said Marie J. Black would not be entitled to accept the consideration paid to the bank for the said oil and gas lease and the annual rentals accrued to and to accrue thereon without being held to have ratified the said lease . . ." In the case of Koenig v. Calcote, et ux., 199 Miss. 435, 25 So. (2d) 763, the Court quoted this rule announced in 12 C. J. S., Cancellation of Instruments, 38, page 996: "Where a party, with knowledge of facts entitling him to recission of a contract of conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm." In Whittington v. H. T. Cottam Co., 158 Miss. 847, 130 So. 745, 748, 76 A. L. R. 332, this Court, in a suit to set aside an instrument allegedly procured by fraud said: "The election is with him. He may affirm or disaffirm the contract, but he cannot do both. If he has full opportunity to learn all the facts and the law applicable thereto, and fails, within a reasonable time, to rescind the contract, he is bound by it." In 35 C. J., p. 1169, Sec. 445, the statement is made: "It has been held that, where a lease was originally invalid for want of title in the lessor, and a subsequent purchaser or the holder of the true title accepts attornment from the lessee under the invalid lease, with knowledge of the terms and conditions of the lease, he validates the lease, . . ." In Davis v. Burrage, 156 F. (2d) 304, 307, the Fifth Circuit Court of Appeals, that Court referring to the Koenig Case, supra, said: "Under Mississippi law, after each plaintiff knew that a conveyance of one-half of the mineral rights under his property existed, or had knowledge of facts that would lead a reasonable man to discover the existence of such a conveyance, acceptance of a payment representing delay rentals on the other half of the mineral rights ratified the mineral deeds taken by

Burrage.'' It was there further remarked: ''. . . An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm. . . . Nevertheless, notice of acts and circumstances which would put a man of ordinary prudence and intelligence on inquiry is, in the eye of the law, equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose . . .'' That Court further observed: ''Thereafter, the said grantors continued to receive annually only one half of the $23.85 provided for as rental under the oil and gas lease held by the Sun Oil Company . . . Then too, the mineral deed was of record at the county courthouse in 1936 when Mr. Calcote 'heard it talked around the community when my check was split, that Mr. Koenig had executed a mineral deed on us,' it having been shown that numerous other conveyances of like nature had been obtained by Koenig in the community where the Calcotes reside. They thus had notice of facts and circumstances which in the eye of the law was equivalent to knowledge of all the facts a reasonably diligent inquiry would disclose.''

It is not a matter of supporting a ratification by constructive or imputed knowledge. It would impugn the intelligence of Mr. Travis, who is shown by the record to be a highly educated, intelligent man, to doubt that he knew what property was covered by the rental payments, especially after the Seale letter and the Nettles conference.

**Alexander, J.,** concurs in this opinion.

**Sydney Smith, C. J.,** delivered the opinion of the court on suggestion of error.

This suggestion of error is filed only on behalf of Gulf Refining Company, and challenges our former decision only insofar as it cancelled the mineral lease executed by

G. B. Travis to the appellant. More narrowly, and in the language of the suggestion of error itself, "The sole point to which this suggestion of error is directed is the one as to ratification vel non of appellant's lease. No other matter will be presented or discussed herein. If, on this record, appellant's lease was ratified or adopted by appellee, then it follows the decree of the lower court as to Gulf Refining Company should be reversed and judgment rendered in this Court in its favor."

This statement of the scope of this suggestion of error limits its complaint to the ratification vel non by the appellee of the execution of this lease to it by G. B. Travis and this opinion should and will be so limited.

The errors claimed by the appellant to appear in our former opinion will be set out and considered seriatim:

"(1) In assuming that G. B. Travis was an agent and that the principles applicable to the ratification of acts of an agent by a principal are controlling."

In their brief filed when this case was originally submitted for decision counsel for the appellant discussed their claim that the appellee was without the right to challenge the validity of this lease under a headnote reading as follows: "Appellee under the facts and the law ratified, approved and acquiesced in said lease and is estopped to dispute or question it by his conduct in accepting and retaining delay rentals thereunder after knowledge of facts and circumstances from which he knew or should have known that same were being paid under claim of ownership of such lease for the purpose of continuing it in full force and effect." Under this heading follows a mixed discussion of both ratification and estoppel, although the difference between the two was pointed out by a quotation from 19. Am. Jur., p. 637, as follows: "Ratification differs from estoppel in essential particulars, *although the distinction has not always been kept by the courts*. The substance of estoppel is the inducement to another to act to his prejudice. The substance of ratification is confirmation after conduct. Rati-

fication is a matter of intention, its existence is a question of fact; in order that there be a ratification there must be a voluntary assumption of the unauthorized act either on full information or on less than full information if undertaken deliberately in disregard of the fact that all knowledge of the transaction available has not been obtained. It does not rest upon prejudice. It has been stated that the distinction between being bound by reason of ratification and being bound by an estoppel is that in the former case the party is bound because he intended to be; in the latter he is bound notwithstanding there was no such intention, because the other party will be prejudiced and defrauded by his conduct unless the law treats him as legally bound.'' (Italics ours.)

Ratification is a technical term peculiar to the law of agency, 1 Tiffany Real Property, 2d Ed., p. 683, though sometimes loosely used in other connection and is defined as ''the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'' 1 Rest., Agency, Sec. 82; 1 Mechem on Agency, 2d Ed., Sec. 347; 2 Am. Jur., Agency, Sec. 208; 2 C. J. S., Agency, Sec. 34.

The contention of counsel for the appellant that the lease here in question has been ratified by the appellee, presupposes that in executing it G. B. Travis, though without authority to do so, acted as the agent of some one to whose right to ratify it the appellee has succeeded, thereby invoking the law of agency, by which to determine their claim to the validity of the lease. We, therefore, did them no injustice in meeting them on the ground, and using the weapon, selected by them—the law of agency—for the decision of this branch of this controversy. This was the most courteous way to deal with the case as presented by counsel, but we would have reached the same conclusion we did had we pointed out, as counsel now do, though continuing to invoke the law of ratification, that since G. B. Travis did not claim to be acting as

the agent of any one in executing this lease but executed it in his own name and of his own right, the law of ratification has no place here. 1 Rest., Agency, Sec. 85.

One may adopt or acquiesce in a contract affecting his property made by another who acted when making it in his own behalf and in his own right by an express or implied agreement so to do with the other party to the contract, but the result thereof is not the ratification of the original contract. Ratification of the unauthorized contract of another affecting one's own interest breathes life into it back to and from its inception, and makes the one ratifying it a party thereto. While in the case supposed the rights of the parties are determined not by the unauthorized contract but by the new agreement relative thereto. How this new agreement must be made when real property is involved will appear later herein.

The second and third errors said by the appellant to appear in our former opinion may be considered together. They are:

"(2) In concluding on the facts of this record that appellee, when he accepted and retained the delay rentals paid by appellant, did not have full and complete knowledge of all the material facts.

"(3) In overlooking the fact that when appellee knew when he accepted and retained said rentals was the equivalent of full and complete knowledge."

Whether the appellee knew that a portion of the land embraced in the lease executed to the appellant by his father G. B. Travis belonged to him when he cashed the delay rental checks given his father and mother in accordance with the lease, was a question of fact for the decision of the Court below. The record contains no direct evidence that he did know this, but only circumstantial evidence indicating that he probably did know it and also that G. B. Travis was without authority to include the land in the lease. The appellee, however, when testifying on his own behalf under rigid cross-examination denied any such knowledge, which testimony the Court

below had the right to, and did, believe, and we are unable to say ''acting judicially'' that it was manifestly wrong in so doing.

The fourth error said by the appellant to appear in our former opinion is: '' (4) In overlooking the fact that if it were correct to say that appellee did not have full and complete knowledge when he accepted and retained said rentals, he deliberately chose to act upon the knowledge he then had without waiting for the report of his brother as to the investigation he testified he requested his brother to make, and must be held to his election.''

In other words, the claim here is that if the appellee was ignorant of the fact that his land was embraced in this lease executed by his father, that he was wilfully so. If such is the fact, he should be either charged with such knowledge or that he acted with all the knowledge he cared to have in the matter. There is nothing in the evidence to justify this conclusion. He may have been careless in what he here did, as his evidence indicated that he probably is in his business matters, but carelessness is not willfullness. And as will appear in the discussion of appellant's fifth complaint the knowledge vel non of the appellee of the facts just hereinbefore discussed is not determinative of the questions raised by this suggestion of error.

The fifth error said by the appellant to appear in our former opinion is: '' (5) In not holding under the undisputed facts of this record that appellee deliberately recognized, adopted and ratified the apellant's lease, and having so done, was and is without right to question or repudiate it.''

This lease was executed for a term of ten years, and under Section 264, Code 1942, the statute of frauds, ''an action shall not be brought whereby to charge a defendant or other party . . . upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; . . . unless . . . the promise or agreement upon which

such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some person by him or her thereunto lawfully authorized in writing." The appellant makes no claim that there is any written instrument, or writing of any character in this evidence, that complies with this statute. The only written instruments in the evidence that could be said to remotely bear thereon is the appellee's endorsement of the names of his father and mother to the delay rental checks and the receipts issued to the appellant therefor, which set forth the fact that the checks were issued in payment of delay rentals under the lease executed by G. B. Travis. There instruments, even if the character of the appellee's signatures thereto be left out of view, obviously do not comply with the requirements of Section 264, Code 1942, even should it be claimed that they do. In order to comply with this section the memorandum must contain words appropriate to, and indicating an intention thereby, to convey or lease land, must identify the land, set forth the purchase price, or, if a lease, the rent to be paid, and the terms of payment. Milam v. Paxton, 160 Miss. 562, 134 So. 171; and Howie v. Swaggard, 142 Miss. 409, 107 So. 556 (an instructive case here). This Court has consistently declined to engraft any exception on this statute and does not permit even the payment of the purchase price for land, or the agreed rental therefor, to take the case without the statute. This being true, the appellee's knowledge vel non of the fact that his land was included in the lease executed by his father to the appellant when he cashed the rental checks issued to his father therefor is of no value here in the absence of the written instrument required by the statute of frauds. This statute was called to our attention by counsel for the appellee in the brief filed by them on the submission of this case, wherein they said: "Moreover, it will be remembered that neither Mrs. Hooks nor appellee signed any of the mineral instruments and the statute of frauds has full application. Hence we submit,

there can be no 'ratification' at least in the absence of an estoppel.''

The appellant's sixth and last contention is that we erred: ''(6) In overlooking the fact that appellee unduly delayed after acquiring sufficient knowledge, and after having received and retained yearly delay rentals paid to him, to move to repudiate the said lease or to sue to rescind and cancel it.''

The appellee acquired his title to the land in January, 1943, and this suit was begun by him in March, 1945. Under the evidence, which the Court below accepted, he acquired knowledge of the fact that his land was included in the lease executed by his father to the appellant in December, 1944. What the appellant seems to here invoke is the doctrine of laches, which, in legal significance, ''is not mere delay (in beginning an action or suit), but delay that works a disadvantage to another.'' Comans v. Tapley, 101 Miss. 203, 57 So. 567, 573, Ann. Cas. 1914B, 307. No disadvantage or injury to the appellant is here claimed because of this short delay in the institution of this suit, consequently the doctrine of laches has no application here.

The suggestion of error will be overruled.

**L. A. Smith, Sr.**, and **Griffith, JJ.**, concur in this opinion.

**Roberds, J.**, delivered a dissenting opinion.

I adhere to the views I expressed in my dissent to the original opinion herein.

**Alexander, J.**, joins in the above dissent.

**McGehee, J.**, delivered a dissenting opinion.

As shown by a notation which immediately follows the former opinion whereby this case was affirmed, I took no

part in the decision on account of being a close kinsman of some of the appellants. The judgment of affirmance has now become final as to them, their part of the cost has been paid, according to the records of this Court (Cost Book 62, page 207), and no suggestion of error has been filed on their behalf, although the time for doing so has long since expired.

After having read both the controlling and dissenting opinions heretofore rendered, which involve the construction of the registry statutes, Sections 867, 868, and 869, Code 1942, as applied to the facts of this case, and also the question of whether or not the law of estoppel and ratification had been correctly applied as announced by the former decisions of this Court and particularly in the recent cases of Merchants & Manufacturers Bank et al. v. State, 200 Miss. 291, 25 So. (2d) 585, 591, and Koenig v. Calcote et ux., 199 Miss. 435, 25 So. (2d) 763, together with the earlier case of Whittington v. H. T. Cottam Co., 158 Miss. 847, 130 So. 745, 76 A. L. R. 332, and as followed in the case of Davis v. Burrage, 156 F. (2d) 304, 307, recently decided by the Fifth Circuit Court of Appeals, wherein there is quoted with approval a considerable portion of the unanimous opinion of this Court in the case of Koenig v. Calcote, supra, all of which cases are quoted from by Justice Roberds in his dissenting opinion, in which Justice Alexander concurred, I concluded to carefully study all of the briefs in the case at bar and make a diligent and thorough examination of the four volume record and the volume of exhibits to the testimony involved herein. And it was not until I had done this, and had learned of the finality of the judgment here against all of the appellants save the Gulf Refining Company, that I definitely decided that I should participate in the consideration of the suggestion of error which is filed solely on behalf of the said appellant. I am further prompted to do so because of the realization that if I had not been related to any of the the other appellants, or had never heard of them before, the decree appealed

from would have been reversed by a majority vote of the Judges who would have then participated in the decision. But let it be judged as to whether or not this opinion will disclose within itself a justification for being written, and as to whether or not there is any merit in the appellee's case.

On September 10, 1932, when the courthouse and all of the land deed records of Jasper County were destroyed by fire, G. B. Travis, the common source of title herein, was the undisputed record owner of the land described in the oil and gas lease now sought to be cancelled, and which lease was executed by him and his wife, on October 21, 1937, and promptly filed and recorded, in favor of the appellant Gulf Refining Company without any notice of the five year old and unrecorded deed in favor of his daughter, Mrs. J. H. Hooks, through whom the appellee now claims, dated June 14, 1932.

One of the deed of trust records, B TT, was not destroyed by the fire, and it contains the recordation of a deed of trust given by G. B. Travis prior thereto on the land in question. Thereafter he executed in 1933 an oil and gas lease in favor of Eastman-Gardner Company, which later lapsed, and a mineral deed in favor of Frederick G. Cox, trustee, both of which were promptly recorded in the new deed records, and these conveyances were also taken without notice of the said prior unrecorded deed.

Mr. Travis had acquired the land here in question through the foreclosure of a deed of trust given by the former owner, Webb Newell, in favor of G. B. Travis and Son, wherein the appellee, J. A. Travis, was one of the beneficiaries, and on the said 14th day of June, 1932, prior to the destruction of the records by fire, as aforesaid, G. B. Travis, who was then engaged in the mercantile business, conveyed the land by deed absolute in form to his daughter, Mrs. J. H. Hooks, who then resided at Grenada, Mississippi, in consideration of her agreement to pay an indebtedness of approximately $300 which the grantor

owed on the land to Threefoot Brothers at Meridian, Mississippi, and which she soon thereafter paid.

The deed in favor of Mrs. Hooks was not filed or placed of record until nearly ten years after its execution, and then only at the instance of the appellee J. A. Travis. When asked as to why she did not have her deed recorded promptly, she testified, "Well, it rained terribly hard and the roads (to Paulding) were awfully bad." And her only other explanation in that regard was that "I seem to have had the impression I had to record it in person. Q. You had to record it in person? A. Yes." And her husband, Dr. J. H. Hooks, a Baptist minister, was asked as a witness at the trial, "Now, then, when was it you decided to record the deed from Mr. Travis to your wife? A. That was when we were informed by Alna (J. A. Travis, appellee) that there were several papers in his father's possession he failed to have recorded, and he had assumed the responsibility of trying to get matters straight, looked through the papers as I recall and discovered several not on record that should have been, and he also called our attention to the fact that the deed to our property, which had been our property, was not recorded." Just how the appellee could have called their attention to the fact that the deed from G. B. Travis to Mrs. Hooks had not been recorded, unless he found it among his father's papers, in the light of his testimony that he had not examined the records, is not explained. In other words, it does not appear how he would have known that it was not of record, without having examined either the deed or the records unless she, or some other member of the family, had previously advised him that she was withholding it from the record. He testified that, "I knew my sister owned the Webb Newell place in 1932," but he does not claim to have seen the deed until in April, 1942, when it is claimed that she sent it to him by mail at his request immediately prior to its recordation on April 13, 1942, which was im-

mediately following his examination of his father's papers as mentioned by Dr. Hooks.

But there is no dispute in the testimony that Mrs. Hooks paid a consideration for this deed. She produced written evidence of having paid $125 on the debt assumed, and she testified that the deed was kept in her possession until it was sent to the appellee in 1942 as aforesaid. But the testimony of her husband hereinbefore quoted, together with the fact that her father G. B. Travis on April 20, 1933, executed the standard mineral lease to Eastman-Gardner Company and the deed for a one-half undivided interest in the minerals in place to Frederick G. Cox, trustee, on April 24, 1933, and continued to do each and everything he had done before he made the deed to her, plus the keeping of the deed off the record until after the grantor therein had become totally and permanently incompetent, strongly indicates that the deed may have been intended merely as security. In fact, the action of her father in executing the subsequent conveyances above mentioned within less than a year from the date of this deed, and in executing the lease here in question with warranty of title in favor of the Gulf Refining Company on October 21, 1937, thereby representing himself to be the owner of the land, expressly claiming the land by oral statement and producing his current tax receipts thereon, and retaining the cash consideration and the annual rentals therefor, together with that received for these two former conveyances, without ever having mentioned the fact to Mrs. Hooks, his only daughter, that he had collected this money, can not be reconciled on any other theory than that her unrecorded deed was then no longer considered by them to be effective as such, unless it should be assumed that he was willing to give conveyances on property which he knew he did not own, thereby dealing unfairly and unlawfully with his lessees and grantees in getting their money, and likewise unfairly with his daughter in withholding any knowledge

thereof from her. The latter theory is wholly inconsistent with the fact that Mr. Travis was shown to be a man of outstanding honor and integrity.

The proof discloses without dispute that after the deed was executed by G. B. Travis in favor of Mrs. Hooks in 1932 he continued to pay the taxes on the land in his own name; that he made an annual payment to the Federal Land Bank thereon continuously until 1940, when he became totally incompetent, the amount of which annual payments Mrs. Hooks testified she did not ever learn; that he made the trades with the tenants on the place and they paid the rent to him; that he signed subordination agreements as landlord in favor of the Credit Production Corporation; that he kept up such repairs as were made on the place at his own expense, and continued to manage and control the operation of the farm, and that he manifestly represented to the representative of appellant that he owned the land at the time he executed the lease in question, since the lease warrants the title as his own, and no sensible man would have paid out his company's money and induced it to pay annual rentals under the lease unless the lessor had claimed to be the owner of the land described therein. Moreover, according to the positive testimony given on behalf of the appellee by one of his brothers, the lessor, G. B. Travis, was actually found on this land with Lawyer Abney, the alleged tenant of his daughter Mrs. Hooks, who then lived in Louisiana, at the time the first interview was had by the representative of the appellant in regard to the procurement of this lease. That is to say, there was no substantial change in the occupancy of the property such as to arrest the notice of a prospective purchaser, as expressly required by the recent decision in the case of Lay v. Nutt, 194 Miss. 83, 11 So. (2d) 430, 432, wherein the Court said: "Regardless of the effect of those decisions sustaining constructive notice where lands conveyed are in the possession of third persons as tenants or therwise (Gordon v. Sizer, 39 Miss. 805; Stovall v. Judah, 74 Miss. 747, 21

So. 614, and cases cited), this principle finds exception where the posession is by relatives or members of grantor's family. . . . There must be so substanial a change in the occupancy of the property as to arrest the notice of a prospective purchaser.'' And although the application of Sections 867, 868 and 869, Code 1942, which give priority in title to the holder who first files his conveyance for record ''in the absence of actual notice'' is not re-argued on the suggestion of error, I take this opportunity to dissent from the construction given those statutes in the former controlling opinion herein, *as applied to the facts of this case.*

After G. B. Travis and his wife became invalids, and to a large extent helpless, in 1940, Mrs. Hooks made a quitclaim deed of the land here in question to her brother, the appellee J. A. Travis, on January 4, 1943, in order that he might devote the revenue therefrom as a contribution to the expense of supporting and maintaining her said parents, at a time when it was of course known to some of her brothers, and as a matter of common knowledge, that the land could have been then leased for oil and gas, and conveyances made for part of the minerals in place, for a great deal more money than the net yield of the land as a farm had amounted to during its continued operation by her father for the entire time that Mrs. Hooks had held the unrecorded deed thereto, unless it was then known to the appellee that it was already under lease to the appellant. In fact he had already collected two annual rental checks under the said lease, of which he and Mrs. Hooks say she was not advised. As a matter of fact two of her brothers testified to having been present when the lease here in question was executed in favor of the appellant on October 21, 1937, and one of them admitted he signed this lease as a witness. Mrs. Hooks testified to having received none of the rentals from the lease and only about $35 or $40 from the operation of the place by her father as a farm from 1932 to 1940, inclusive, which amounts were in trade at the store.

The appellee had taken charge of this land, along with other lands of his father and that of his mother, in 1940 in order to devote all of the net revenue therefrom to their support and maintenance. And he testified that he did not know that this Webb Newell tract was included in the 270 acres covered by the lease in favor of the appellant, until he obtained an abstract thereof in December, 1944, after having cashed four annual rental checks thereon in 1941, 1942, 1943 and 1944, each of which checks contractually provided in the face thereof that the amount being paid was "in settlement of rental for the period hereinafter stated, and as per terms of mineral lease described as follows" (describing it), and which checks also specified in the face thereof the date of the lease and the parties thereto, the location of the land, and that the rental was for an annual extension period beginning on the date thereof. For instance, the check cashed by the appellee as of October 21, 1944, read as follows:

"Shreveport, Louisiana
9-20-44

The Gulf Refining Company has this day mailed to Bay Springs Bank,
Bay Springs, Miss.
its check for the amount hereinafter set out for deposit to the credit of the parties named, in payment of rental for the period stated, under terms of mineral lease described as follows:

| File No. | For credit of | Rental of annual period beginning | Amount |
|---|---|---|---|
| 15,295 | G. B. Travis and Ida Travis | 10-21-44 | $23.75 |
| | 935 Morningside St., Jackson, Miss. | Exchange | .60 |
| | | | $24.35 |

Lease from G. B. Travis et ux to Gulf Refg. Co., dated Oct. 21, 1937,

covering said parties' interest in
270 acres in Sec. 26, Twp. 1 N., Rge.
12 E., & Sec. 5, Twp. 10 N., Rge. 10
W., Jasper County, Miss.

All parties named above sign receipt at bottom of
this letter. Returning letter and receipt to me in
the enclosed stamped addressed envelope.

Yours truly, D. V. Blocker

Do Not Detach

Received the above amount of money, being full pay-
ment for the purpose and for the period and under
the terms of said instrument mentioned above.

(Signed)    Ida Travis Deceased

G. B. Travis by J. A. Travis''

This photosatic copy of the above mentioned check,
and similar copies of two of the others, were introduced
as exhibits to the testimony on behalf of the appellee,
which photostats disclosed the information above shown;
and that this data as to the name of the payees, the des-
cription and date of the lease, names of the lessors and
lessee, acreage of land and its location, etc., was typewrit-
ten in the face of the check itself.

The appellee necessarily knew from the face of these
checks that they were being sent to renew or extend the
lease each year, and that the 270 acres mentioned therein
and covered by this annual rental included the Webb
Newell tract, the title of which his father acquired as
aforesaid by foreclosure of a deed of trust in which the
appellee was one of the beneficiaries. A son may not
know the numbers of his father's land, but he neverthe-
less knows the approximate acreage thereof, and from
whom his father has acquired the same. He testified that
he knew that the Webb Newell tract, which all the proof
shows is embraced in the 270 acres, was conveyed in
1932 to his sister Mrs. Hooks. He was in charge of and
operating the entire 270 acres, and had been during the

three years prior to cashing the check above quoted, and during which three years he had cashed the others.

In view of the date of his own quitclaim deed from Mrs. Hooks, on January 4, 1943, it clearly appears that appellee cashed the last two of these checks after he acquired such deed. In doing so he could not have been acting as agent for his parents, and especially when he cashed the one for 1944 hereinbefore quoted, since it shows on its face that his mother was then dead and the proof is that his father had been totally incompetent throughout the years from 1941 to 1944, inclusive. There was no one who could have constituted him such an agent. He was, therefore, acting in his own behalf when he cashed these last two checks, because he claims that he owned the land, and he had a deed to it, at the time each of them was cashed. Nor could the appellee have been acting as agent for Mrs. Hooks when he cashed the checks in 1941 and 1942, before she conveyed the land to him, since he and his brothers, as well as Mrs. Hooks, all testified that she knew nothing about the fact that the land had been leased or that any of these rental checks were being received.

Aside from the fact that the checks on their face disclosed the information that the entire 270 acres were under the lease of October 21, 1937, in favor of the appellant Gulf Refining Company, the appellee wrote to the said Company on October 23, 1942, after having, on September 28th of that year, cashed the check extending the lease for another year, beginning on October 21, 1942, and requested the appellant to thereafter "clear rental payments through the Deposit Guaranty Bank & Trust Company, Jackson, Mississippi." They were then being cleared through the Bay Springs Bank, as shown on the photostatic copies thereof introduced in evidence, and as shown by the testimony of the cashier of the said Bank. And in reply to this letter he was advised that the depository bank could not be changed without the signatures of twenty-three people who held mineral rights under a conveyance from his father to C. R. Ridgeway, dated

October 22, 1937. He necessarily knew that the appellant was referring to a conveyance including this land, since he is bound to have known that it was included in the 270 acres which he then had charge of, and which acreage was specified in the check which he had then recently cashed.

Moreover, on March 20, 1944, prior to the cashing of the last check by the appellee hereinbefore quoted in full, he received a letter from Eugene Seale, a title attorney of the appellant Gulf Refining Company, describing the land embraced in the Webb Newell tract in the caption of the said letter, calling attention to the lease to the Gulf Refining Company executed by Mr. and Mrs. G. B. Travis, mentioning other lands in the letter, and stating that: "However, the balance of the land (referring to that about which he was writing) was evidently acquired by G. B. Travis from Webb Newell, although there is no deed of record from Webb Newell." The appellee testified that he received, but did not read, this letter; and further that, "when I saw it *requested* a quitclaim deed from me to one Will Harrison on the 40 acres of land included evidently in the Webb Newell deed, according to this man (Seale), I took it to my brother (Cecil Travis) and asked him to attend to it." (Italics mine.)

Notwithstanding the testimony above mentioned in regard to not having read the letter, it appears from the letter sent up to this Court for inspection as an exhibit to the testimony of the appellee that the first page of this single spaced typewritten letter contains six paragraphs and that the *request* for the quitclaim deed appears in the last two lines of the sixth paragraph at the bottom of the first page of the letter. And his brother to whom he delivered the letter testified that, "I threw it down in the basket; it finally got into the files. Q. Did you read the letter? A. No." However, he did not mean that he threw it in the wastebasket, but in a basket on his desk.

There was attached to the letter above mentioned a map or plat specifically designating a portion of the land embraced in the plat as being the ''Webb Newell'' land. At the time this letter was thus received, the Helen Morrison discovery oil well in the Heidelberg field was located approximately a mile and a half from this Webb Newell tract, and had been in production for nearly three months.

Moreover, in June 1944, S. R. Nettles, an attorney who was then doing title work for the appellant, and because of the illness of the attorney Seale, had resumed the negotiation with appellee, following the failure of the former to obtain any reply to the communication of March 20, 1944, and had a conference in the office of Cecil Travis, at which the appellee was admittedly present part of the time, and at which time the appellee had procured from his home and produced for Nettles, who was known to be acting on behalf of appellant, the original trustee's deed whereby G. B. Travis had acquired this Webb Newell land, together with the original deed of trust executed by Webb Newell, and the proof of the publication of the notice of sale thereunder, all of which documents were delivered to such representative for re-recordation. Photostats of these instruments were caused to be made by Nettles on that day, copies of which were left with the Travises until the originals could be re-recorded and returned to them.

On the conflicting evidence given by Nettles and Cecil Travis as to what was discussed on that occasion, the Chancellor could have found that the appellant's oil and gas lease of October 21, 1937, given by G. B. Travis and wife, was not specifically mentioned in this interview which lasted approximately forty-five mintues. But it was wholly immaterial whether the lease was specifically mentioned or not, since the Travises necessarily knew for what purpose Nettles wanted to re-record these instruments. The appellee knew that annual rentals were then being collected from appellant under this lease cov-

ering this particular land, as a part of the 270 acres mentioned in the checks which specified in the face thereof that they were for annual extensions of this particular lease, giving its date, the names of the lessors and the lessee, the total acreage of the land and where it was located, as hereinbefore stated, which had been in the charge and management of the appellee for more than three years at that time.

Then, too, he had been paying the taxes during said time on this land for three years, as part of the 270 acres, in the name of his father, and therefore necessarily knew that the lease covering 270 acres included the Webb Newell tract which was then in his charge and control. Nevertheless, he cashed another check thereafter, the one hereinbefore quoted in full, and his endorsement of this check discloses that his mother was then dead, and the proof disclosed without dispute that his father was then totally incompetent. This was done while appellee was holding a deed from his sister in his favor to this land. He was therefore acting in his own right, ratifying and confirming a further extension of the lease far beyond the date of the filing of this suit, endorsing and becoming bound by a memorandum in writing, obviously sufficient within the statute of frauds for that purpose, and specifically referring to the lease here in question.

It is true that the appellee testified that he did not receive any personal benefit from cashing these checks, but he also testified positively at three places in the record that he used the proceeds thereof to reimburse himself, and the proof shows that he either deposited these three checks to his own account or cashed the same for the purpose above stated. To quote his exact language, he said, ''I was merely reimbursing myself for money expended.'' The Chancellor thereupon stated into the record that, ''I don't see the pertinency of it,'' meaning what he did with the money. In this conclusion the Chancellor was manifestly correct, because if one accepts the rentals from a lease on his own land made by another,

and aids in converting the money to either the use and benefit of him who has assumed to make the lease or to his own use, he thereby ratifies and confirms what has been done. Furthermore, he is estopped to assert the contrary as complainant in a court of equity.

If he had rejected the first check received after he got his deed on January 4, 1943, insofar as it covered his land, the appellant could have acquired leases on other lands for its block of development in its stead, before the discovery well was brought in in December of that year, at a price far less than when appellee filed this suit in 1945, it being suggested that this land is probably worth $500,000. It is therefore, and I say it with deference, not debatable that appellant has been misled to its injury by the appellee's course of dealing with this lease, and that he is. estoped to now question its validity, seeking affirmative relief in equity.

And yet, notwithstanding all of the foregoing facts it was held by the trial court that there had been no ratification and confirmation of this lease by the appellee; and it was evidently so found upon the untenable theory that the appellee did not know that the Webb Newell tract was under lease until he obtained an abstract in December, 1944. This finding was made notwithstanding that the appellee had testified that he began urging his said brother Cecil in January, 1944, to get him up an abstract to this land and repeated such requests at least once or twice a month in the meantime. He had another lawyer brother living at the county seat at that time where this lease was of record, and since the land records were. burned in 1932 there were no conveyances to be abstracted except the trustee's deed to G. B. Travis, which has been re-recorded after the fire, the deed from G. B. Travis to Mrs. J. H. Hooks and her deed to the appellee, all of which he admittedly had in his possession, and the leases and mineral deeds hereinbefore mentioned, executed prior to the recordation of his deed.

Information as to the lease under which the appellee knew he had been collecting annual rentals from the appellant could have been obtained in a few minutes time during the year 1944, when lands near the oil wells in the vicinity where this tract was located were being leased, as a matter of common knowledge, at fabulous prices because of the discovery of the Helen Morrison well in December, 1943, only ten miles from the Eucutta field, discovered in July, 1943, as aforesaid. It is unbelievable that if the appellee had not known that this land was under the 270 acre lease of the appellant he would have waited from January until December, 1944, to have ascertained such fact, since he would have of course wanted to get the land in production. He could have found out by return mail, by writing the office of appellant from which he was receiving his rental checks. Of course he already knew, and the proof is conclusive that he did.

But it is urged on behalf of appellee that the issue as to whether there was a ratification and confirmation of this lease, or an estoppel by conduct, was a matter for the discretion of the Chancellor. The case of Sample v. Romine, 193 Miss. 706, 709, 8 So. (2d) 257, 9 So. (2d) 643, 10 So. (2d) 346, is cited and quoted from as authority therefor. But, as clearly disclosed by the opinion therein, the court was dealing with a question of laches. The application of that doctrine is largely within the judicial discretion of the court, unless completion of the bar of some statute of limitation leaves the court no discretion.

In the case at bar the evidence is conclusive, as aforesaid, that the appellee endorsed these checks with full and complete knowledge of all the material facts and circumstances insofar as the existence of this lease on this land is concerned, and of his rights in the premises, without regard to whether or not he failed to learn of the alleged details in connection with the *execution* of the lease until December 1944, as those details were dramatized in the testimony of two of his brothers who claim

to have been present when the lease was executed, and in which testimony it was claimed that the representative of the appellant took the lease originally and paid out the money of his principal therefor, after being then and there told that the title was in Mrs. Hooks—testimony which was rejected by the Chancellor as evidenced by his express finding that the appellant had no actual notice of any other ownership than that claimed by the lessor G. B. Travis.

It is said in the former controlling opinion herein [29 So. (2d) 100, 104]: "We think it is not of controlling consequence whether or not appellee read the documents and the letter above mentioned, for, if he had done so, none of them would have furnished him any information on the following two facts not only of material, but of dominant, importance: First, as to when it was that G. B. Travis conveyed the land to his daughter, Mrs. Hooks; and of more importance, second, whether Mr. Travis had been authorized by his daughter to execute the lease in her behalf."

However, on the first proposition the appellee testified that he knew that his father had conveyed the land in 1932 to Mrs. Hooks. He personally handled and had her deed recorded in 1942. And the deed, of course, disclosed when it was executed. His deed was from the grantee therein, and he kept on cashing rental checks under the lease. And as to the second proposition there is no contention made on the appeal in this case that Mr. G. B. Travis had been authorized by his daughter to execute the lease in *her* behalf. The contention is, and the proof shows, that Mr. Travis executed the lease in his own behalf, and as being on his own property. He did not purport to act for her in the matter. And she says that she knew nothing about the lease until the year 1944. Nor did the appellee J. A. Travis attach sufficient importance to her rights in the land to tell her that he had collected two rental checks under this lease before she conveyed the land to him by quitclaim deed. If he was acting as

her agent in collecting these two checks, she knew nothing about it; he was manifestly acting for himself when he collected the last two as aforesaid, since he then held a deed to the land. He could not have acted as agent for his parents because they were incapacitated to constitute him such. Therefore, I am unable to see how the uncontrovertible principles of the law of ratification as between principal and agent, set forth in the former controlling opinion herein, can have any application to this case.

Nor can the statute of frauds, Section 264, Code 1942, be a bar against the defense of estoppel and ratification. That statute, among other things, provides that, ''an action shall not be brought whereby to charge a defendant or other party: . . . (c) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; . . . Unless, in each of said cases, the promise or agreement upon which said action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some person by him or her thereunto lawfully authorized in writing.''

The question of whether the appellee was lawfully authorized in writing to sign the check hereinbefore quoted in full, which constitutes on its face a sufficient memorandum in writing within the statute of frauds, is not here involved for the reason that when he endorsed the said check and received the proceeds thereof, as well as the check in September, 1943, he held a deed to the land, and was therefore acting in his own right, as hereinbefore stated, even though he did sign the names of his father and mother thereto as a means of obtaining the money, at a time when his father knew nothing about it, and his mother was dead.

Moreover, the only reference made in the briefs to this statute of frauds is on two pages of the more than 100 page brief on behalf of the appellee, where the con-

tention is made, in the first instance, *not that the statute of frauds is a bar to the defense of estoppel and ratification of a conveyance of an interest in realty*, but that because of the said statute *strict proof* in support of such defenses is to be required, and in the second instance that it applies unless there is an estopel, and such estoppel is abundantly shown here. The conclusive proof here in support of such defenses would obviously amount to as much as strict proof thereof.

Furthermore, we unanimously held quite recently in the case of Merchants & Manufacturers Bank v. State, 200 Miss. 291, 25 So. (2d) 585, 591, that Mrs. Marie J. Black was the owner of the legal title of the land there involved, and had made no conveyance or lease of the minerals, but that she "would not be entitled to accept the consideration paid to the bank for the said oil and gas lease and the annual rentals accrued and to accrue thereon without being held to have ratified the said lease, and she expressly disclaims any intention or desire to ratify the same," even though she had not executed a lease complying with the statute of frauds, or otherwise at that time. She had sought a cancellation of the lease, and at the same time wanted to collect from the lessor bank and its lessee the monies theretofore collected by them as a cash consideration and annual rentals. In the case at bar the appellee seeks cancellation of the lease here in question and is not even being required to do equity by refunding the annual rentals which he collected thereon. Of course, the appellant should not be required to accept such a refund in view of appellee's ratification and confirmation of the lease in writing on four different occasions, and because of his estoppel by conduct to have the lease now cancelled, in equity.

In the case of Koenig v. Calcote, 199 Miss. 435, 25 So. (2d) 763, 764, 767, concurred in by all of the justices, and quoted from at length as aforesaid by Justice Roberds in his dissenting opinion herein on the former hearing, (and to which reference is here made for the quotation

and for that said by the Fifth Circuit Court of Appeals in the case of Davis v. Burrage, supra,) we held that the Calcotes were not entitled to a cancellation of the mineral deed where they had been collecting annual rentals from the Sun Oil Company under a lease with full knowledge of the facts in the premises, and where the appellant Koenig, the only other litigant in the case, as holder of the mineral deed, had not, of course, paid any part of such rentals under the lease to them. In that case, as shown by the opinion therein, Koenig set up the defense "of whether or not there was a subsequent ratification of the deed by the grantors after being advised of its import." But it is said in the former controlling opinion herein that the case referred to "was not one involving ratification but was a suit to rescind and cancel a lease made by the party complainant himself." Since the case of Koenig v. Calcote, supra, did in fact involve the question of ratification where the Calcotes were seeking a cancellation of the deed, with full knowledge in the premises when they accepted the annual rentals from an oil company which was not involved in the litigation, I am unable to see any difference between a conveyance being ratified by the grantor and one being ratified by a vendee claiming through such grantor with full knowledge of the facts when he accepts the benefits thereof.

Moreover, Mr. and Mrs. Calcote, an humble couple on a farm, with less education than appellee, were held by the trial court not to have had the full import of their conveyance in mind, as written, at the time they signed the same, and were held by this Court to have nevertheless confirmed and ratified the conveyance by accepting one-half of the annual rentals from an oil and gas lessee after they had become advised that the defendant Koenig held the mineral deed and was receiving the other half; whereas, it is being held in the case at bar that the appellee, who, as shown by the testimony, holds two college degrees, and has been connected with the State Department of Education, served as Assistant to the Presi-

dent of a college, and is now serving as Director of its Endowment Campaign, did not ratify and confirm the lease here in question on the ground that he didn't know what he was doing, or what it was all about. But as to whether a person may avoid the consequences of his acts on the ground that he did not read or pay any attention to the contents of the writings that he has signed, the following cases hold in the negative: Continental Jewelry Co. v. Joseph, 140 Miss. 582, 585, 105 So. 639; Gunter v. Henderson Molpus Co., 149 Miss. 603, 621, 115 So. 720; Fornea v. Goodyear Yellow Pine Co., 181 Miss. 50, 64, 178 So. 914; Alliance Trust Co. v. Armstrong, 185 Miss. 148, 163, 186 So. 633. These cases were cited in the case of Koenig v. Calcote, supra, to support the theory of a ratification on the part of the Calcotes notwithstanding that they did not read or comprehend the information furnished them on the rental checks which they cashed.

As to the rentals under the lease now in question being only at the rate of twenty-five cents per acre, the lease was made about two years before oil had been discovered anywhere in this State or in any other southern state east of the Mississippi River, and, as in the Calcote case, the price was in keeping with what was being paid to other lessors throughout the State at that time.

Finally, in the former controlling opinion herein, in answer to the argument that the appellee's education and experience, and his more than average general intelligence, disprove his contention that he didn't read and comprehend the meaning of the instruments he saw and handled, it was observed that if he had known the facts when he accepted the 1944 rental check after the discovery of the first oil well, "he would be made out, not as having any sense, but as being little, if any, better than a moron." The force and logic of this observation can not be answered on any ground save one, which to me is a complete answer, and that is that he had not at that time been able to get his consent to go into court and contend that his father had been guilty of the al-

leged wrong-doing hereinbefore mentioned; or that his father, and his mother who joined in the lease, the two brothers who claim to have been present at the time of its execution, together with the appellee himself, had all failed to advise his sister, Mrs. Hooks, of the fact that these cash considerations and annual rentals had been collected from year to year on this land, or that he had also failed to advise his brother Cecil, who was helping him with the expense of suporting and maintaining their parents, about the fact that he himself had been collecting these rentals for the past four years. Nor was he then willing to contend that the appellant should not have relied upon the truthfulness of his father's representations as to the ownership of the land, but rather should have turned to the negro tenant and obtained his opinion of the title, and as to whether appellee's father was telling the truth in regard thereto.

When the complainant rested his case the testimony and exhibits thereto had fully and completely established that he was estopped to question the validity of this lease and that he had fully ratified and confirmed the same. And there is no contention that any of the testimony offered by the appellant, or any of other defendants, had the effect of weakening or destroying the defenses of estoppel and ratification thus disclosed. It is therefore unnecessary to review or discuss the supporting testimony of the defendant's witness Nettles thereon.

It is true that in the forefront of its brief on the suggestion of error herein the appellant did say that "the sole point to which this suggestion of error is directed is the one as to ratification vel non of appellant's lease." However under Point V of this brief there appears the following caption: "The majority opinion of the Court is in error in not holding under the undisputed facts of this record that appellee deliberately recognized, adopted and ratified the appellant's lease, and having so done, *was and is without right to question or repudiate it.*" (Italics mine.) Thus it will be seen from the above itali-

cized words that it is obvious that the appellant does invoke the fact that the appellee is *estopped* by his conduct by reason of having *ratified* and confirmed the lease. In fact fifteen pages of the brief are there devoted to a discussion of this point, with numerous citations of authorities to which no reference is made in the controlling opinion on the suggestion of error.

Moreover, Under Point VI of the brief there appears the following caption ''The majority opinion of the Court is in error in overlooking the fact that appellee unduly delayed acquiring sufficient knowledge, and after having received and retained yearly delay rentals paid to him, to move to repudiate the said lease or to sue to rescind and cancel it.'' The controlling opinion on this suggestion of error also states that ''no disadvantage or injury to the apellant is here claimed because of this short delay in the institution of this suit, . . .'' Yet the record discloses a stipulation at the instance of the appellant that it had drilled a well at a cost of $83,973, at the time the trial court cancelled its lease. This expenditure was made in reliance upon the validity of the lease, as to which the appellee was fully advised, since he was making frequent trips to the area of this block of development. And all of the proof discloses, aside from a matter of common knowledge, that if the appellee had rejected either of the first three checks that he cashed as rentals under this lease prior to the bringing in of the discovery well in the field, the appellant could have acquired other lands for its block of development at an almost nominal consideration in comparison with what this land is said to have been worth in March 1945 when this suit was filed. The appellee is so obviously estopped to question the validity of this lease, on account of having ratified it in writing four times, that we should not concern ourselves as to whether the *last* brief is too limited in scope as to permit a consideration of the question of whether he is estopped to question the lease because of having thus ratified it, or whether he has merely ratified it, because

he has estopped himself by both his conduct and written assent to now assert the contrary. I respectfully submit that it is too highly technical for the Court on this suggestion of error to hold the appellant strictly to the observation made in the forefront of its brief thereon where it is said that the discussion would be directed solely to the question of ratification, in view of the discussions of an estoppel which later appears under Points V and VI, and especially in a case so barren of merit as not to justify an affirmance on any ground.

In the sixth paragraph of the controlling opinion on the suggestion of error it is assumed that the appellant in its original brief had invoked ''the law of agency, by which to determine the validity of the lease.'' And the opinion states that: ''We, therefore, did them no injustice in meeting them on the ground, and using the weapon, selected by them—the law of agency—for the (former) decision of this branch of the controversy.'' The quoted observations were made upon the theory that the contention of the appellant that the appellee had ratified the lease ''presupposes'' that G. B. Travis had undertaken to act as agent in executing the lease, and I understand that the writer of that opinion does not mean that any question of the law of agency was ever discussed by the appellant, since its position is clearly set forth throughout its briefs that G. B. Travis was acting in his own right as owner of the land and was not purporting to act for anyone else, when he executed the lease, and received and kept the cash consideration and the annual rentals thereon, without feeling under any obligation to even mention the same to his daughter or account to her therefor. I, therefore, submit, with the utmost deference, that counsel for appellant are not being met ''on the ground, and using the weapon, selected by them—the law of agency . . .'' Moreover, the affirmance of this case overlooks the fact that without regard to any question of principal and agent a person may *ratify* a lease executed by another on his land without authority,

where he accepts and retains the benefits accruing under the lease with full knowledge of the facts, as was done by the appellee in the instant case, because he is *estopped* in a court of equity to assert that he has not thereby *ratified* and adopted it as his own; and that he may also become *estopped* to question the validity of such a lease because by his conduct in regard thereto he cannot assert in equity that he has not *ratified* it.

In the discussion of the statute of frauds, Section 264, Code 1942, found in the controlling opinion on the suggestion of error, it is said that "the appellant makes no claim that there is any written instrument, or writing of any character in this evidence, that complies with this statute. The only written instruments in the evidence that could be said to remotely bear thereon is the appellee's endorsement of the names of his father and mother to the delay rental checks and the receipts issued to the appellant therefor, which set forth the fact that the checks were issued in payment of delay rentals under the lease executed by G. B. Travis." Responding to these observations, it should be said first that no reference whatever is made by the appellant's counsel to the statute of frauds for the reason that they evidently did not consider that such statute has any application to the issues involved in this case. But, if it can be said that it does apply, then, in the second place, it should be observed that the written instruments in evidence not only "set forth the fact that the checks were issued in payment of delay rentals under the lease executed by G. B. Travis," as stated in the controlling opinion now rendered, but they expressly state that the checks are given *in annual renewal* of a specific lease, giving its date, the parties thereto, and the quantity and location of the land as hereinbefore stated; and in my opinion there can be no question but that these instruments are amply sufficient under the statute of frauds to constitute a renewal of his lease by the appellee, twice as representing the lessors and twice while acting in his own right.

It is to be noted that no attempt is made either in the former controlling opinion or in that on this suggestion of error to distinguish the case at bar from that of Merchants & Manufacturers Bank et al. v. State, 200 Miss. 291, 25 So. (2d) 585, hereinbefore cited, wherein Mrs. Marie J. Black, as owner of the land, had signed neither a lease nor a memorandum in writing relating thereto, and where it was expressly held by this court that nevertheless she could not accept the delay rentals without ratifying the lease given without authority by another on her land. Nor has the case of Koenig v. Calcote, supra, been successfully answered on the issue of ratification.

And it is said in the controlling opinion on this suggestion of error that ''whether the apellee knew that a portion of the land embraced in the lease executed to the appellant by his father, G. B. Travis, belonged to him when he cashed the delay rental checks given his father and mother in accordance with the lease, was a question of fact for the decision of the court below.'' That is true, but when the proof is conclusive, as here, that he did know that the land in question was embraced in the 270 acres mentioned in the face of these checks, the finding of fact by the Chancellor to the contrary should not be controlling. If it is controlling under such circumstances, then an appellate court is without power to prevent a litigant's property from being taken from him in disregard of both the facts and the law.

The recitals in this opinion as to what the record discloses in this case, hereinbefore set forth, can not be successfully challenged; and this being true, I respectfully submit that no opinion has been, or can be, written that will justify the affirmance of this case.