# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01654-COA

JAMES L. HUGHES                                                                APPELLANT

v.

SANDRA HUMPHREYS SHIPP, DAVID SHIPP,                      APPELLEES
INDIVIDUALLY, DAVID SHIPP D/B/A ROSE
LAKE LLC, AND ROSE LAKE LLC

| | |
|---|---|
| DATE OF JUDGMENT: | 09/13/2018 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DENNIS L. HORN |
| | SHIRLEY PAYNE |
| | LEIGH KATHRYN PAYNE HORN |
| ATTORNEYS FOR APPELLEES: | JOHN PRINCE MARTIN |
| | DONALD A. McGRAW JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 09/15/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Dr. James Hughes filed a complaint for breach of contract against Sandra Shipp, David Shipp, individually, David Shipp, doing business as Rose Lake LLC, and Rose Lake LLC (collectively, Defendants).  A bench trial was held on the matter in the Yazoo County Chancery Court.  At the conclusion of Dr. Hughes's presentation of evidence, the Defendants made a motion to dismiss pursuant to Mississippi Rule of Civil Procedure 41(b) on the ground that Dr. Hughes had shown no right to relief.  After hearing arguments from the parties, the chancellor granted the Defendants' motion and entered an order of dismissal. Dr.

Hughes filed a motion to alter or amend the judgment by way of reconsideration, which the chancellor denied.

¶2.     Dr. Hughes now appeals from the chancellor's order dismissing his case pursuant to Rule 41(b) and the chancellor's order denying his motion to alter or amend the judgment by way of reconsideration. On appeal, Dr. Hughes asserts that the chancellor erred in granting the Defendants' Rule 41(b) motion for an involuntary dismissal. Dr. Hughes maintains that he met his burden of showing that the Defendants ratified the original contract within the statute of limitations and that as a result, he was entitled to recover damages based on rescission, detrimental reliance, and unjust enrichment.

¶3.     After our review, we find that the chancellor's judgment granting the Defendant's Rule 41(b) motion for an involuntary dismissal is supported by substantial evidence in the record. We therefore affirm the chancellor's judgment.

### FACTS

¶4.     Dr. Hughes's claim for breach of contract stems from the proposed development of a gated community on property owned by Thomas Shipp (Tom), the husband of Sandra Shipp (Sandy) and father of David Shipp (Dave). The proposed development, known as Rose Lake,[1] was located on property near Bentonia in Yazoo County, Mississippi.

---

[1] Throughout the record, the development is alternatively referred to as Rose Hill, Rose Lake, and Rose Hill Lake. The record shows that the development was listed as Rose Lake on the Secretary of State's website, so we will refer to the development as Rose Lake to avoid confusion.

2

¶5. Dr. Hughes testified that on July 21, 2004, he met with Tom regarding the development of Rose Lake. Dr. Hughes submitted into evidence the written agreement between himself and Tom regarding Dr. Hughes's investment in the development. The agreement was dated July 21, 2004, and it was written on Tom's letterhead. The written agreement states as follows:

> In consideration of the sum of One (1) dollar plus other good and valuable tender, I, Tom Shipp, sell and convey to [Dr. Hughes], two (2) lots of approximately four (4) acres each on a lake to be constructed on what is locally known as Rose Hill Plantation, Bentonia, Mississippi. Mr. Hughes shall have his choice of lots on the West side of the aforementioned lake upon completion.

Both Tom and Dr. Hughes signed the agreement.

¶6. That same day, Dr. Hughes delivered a check to Tom in the amount of $100,000 for the purpose of participating in the "joint venture"[2] to develop Rose Lake. Dr. Hughes testified that he provided this $100,000 check based on Tom's written representation that Tom was going to develop Rose Lake. Dr. Hughes submitted a copy of the $100,000 check made out to Tom into evidence. The check was dated July 21, 2004.

¶7. On October 21, 2004, Tom died. The final judgment closing Tom's estate provided that Sandy, as Tom's sole beneficiary, was to receive all properties owned by Tom at the time of his death. Dr. Hughes testified that the Defendants did not inform him of Tom's death, nor was he provided notice of his death as a creditor. Dr. Hughes stated that he learned about

---

[2] In his complaint, Dr. Hughes described the development as a joint venture.

3

Tom's death approximately one to two years after Tom died. Dr. Hughes never filed any claims against Tom's estate seeking a return of his $100,000 or seeking enforcement of the written agreement.

¶8. Dr. Hughes testified that on May 29, 2008, upon Dave's request, he wrote a check to Rose Lake in the amount of $33,000. After writing "Rose Lake" on the "to" line on the check, Dr. Hughes added Dave's name in parentheses. Dr. Hughes testified that the money was to be used to develop more lots on the north end of the lake. According to Dr. Hughes, in return for the additional $33,000 investment, a third lot in the development would be assigned to him. On the "for" line on the check, Dr. Hughes wrote "Investment lot (total 3)."

¶9. Dr. Hughes testified that after he wrote Dave the check for $33,000 on May 29, 2008, he met with Dave "[m]aybe every six to eight months or so." Dr. Hughes admitted that during those meetings, Dave "never said anything about [Dr. Hughes's] ownership" in the Rose Lake development. Dr. Hughes also admitted that he did not initiate any conversation with Dave regarding his ownership in Rose Lake until March 4, 2015.

¶10. On March 4, 2015, Dr. Hughes met Dave and Sandy for a meal at the Islander Oyster House in Jackson, Mississippi.[3] Dr. Hughes testified that he invited Dave and Sandy to meet him at the Islander Oyster House with the intention of "bring[ing] some finalization of the contract agreement with Tom Shipp to some finality that was appropriate for all."

---

[3] Dr. Hughes's complaint lists the date of this meeting as July 14, 2015. However, the rest of the pleadings and the trial transcript reflect that this meeting occurred on March 4, 2015.

4

¶11. Dr. Hughes testified that at the March 4, 2015 meeting, the Defendants orally ratified the original July 21, 2004 written agreement between Dr. Hughes and Tom. Dr. Hughes maintains that as a result of this ratification, the Defendants became parties to that agreement and assumed Tom's obligation to comply with the terms and conditions of the agreement. After the meeting, Dr. Hughes provided a list of written proposals to Dave and Sandy to review. Dr. Hughes described the proposals "starting points for bringing some finality" to the agreement he entered into with Tom.

¶12. However, the Defendants maintain that no such ratification occurred at the March 4, 2015 meeting at the Islander Oyster House. At trial, Dave testified that the parties barely even talked about Rose Lake during the meeting.

¶13. Dr. Hughes testified that after the March 4, 2015 meeting, the Defendants avoided him and ignored his requests to meet. Dr. Hughes also asserts that because the Defendants failed to take any steps toward performing the original contract, the Defendants therefore breached the contract, justifying its rescission.

¶14. On September 13, 2017, Dr. Hughes filed a complaint against the Defendants for breach of contract. Dr. Hughes specifically alleged that "[the] Defendants have committed a substantial and material breach of the contract, justifying its rescission." Dr. Hughes sought $133,000 in unjust enrichment, along with consequential damages, punitive damages, pre-judgment interest, post-judgment interest, and attorney's fees. Dr. Hughes attached a copy of the July 21, 2004 written agreement to the complaint, as well as a copy of the July

5

21, 2004 check for $100,000, and a copy of the May 29, 2008 check for $33,000.

¶15.    On October 23, 2017, the Defendants filed a motion to dismiss Dr. Hughes's complaint pursuant to Mississippi Rule of Civil Procedure 12(b)(6). The Defendants argued that Dr. Hughes's complaint failed to comply with the statute of frauds for the following reasons: (1) no written contract for the sale of land was attached to the complaint, and pursuant to Mississippi Code Annotated section 15-3-1 (Rev. 2019), any contract for the sale of lands must be in writing to be enforceable; (2) the statute of frauds requires a contract to describe the land with a reasonable certainty or refer to and identify other writings by the aid of which the description can be made reasonably certain, yet the July 21, 2004 written agreement attached to the complaint "is devoid of any reasonably certain description as to which lots would purportedly be conveyed to [Dr. Hughes] if the contract were enforced"; (3) the written agreement is void because it is "partly in writing and partly in parol"; specifically, the agreement lacks any timeframe for performance or any definition of what constitutes "completion" of the development; and (4) Dr. Hughes is not attempting to enforce the agreement against Tom or his estate but rather against Sandy or Dave, who are not parties to the written agreement.

¶16.    On November 22, 2017, Dr. Hughes filed his response to the Defendants' motion to dismiss, arguing that when consideration is paid pursuant to a contract to convey property, the payor may pursue an action lying in unjust enrichment, even if the contract is not within the statute of frauds.

6

¶17. After a hearing on the Rule 12(b)(6) motion to dismiss, the chancellor entered an order on January 18, 2018, denying the Defendants' motion, explaining that "the [c]ourt finds that there is not a certainty that [Dr. Hughes] is entitled to no relief under any set of facts that could be proven in support of the claim."

¶18. On August 24, 2018, after engaging in discovery, the Defendants then filed a motion for partial summary judgment. In their motion, the Defendants argued that Dr. Hughes's claim to recover the $100,000 he paid to Tom is time-barred. The Defendants asserted that under Mississippi Code Annotated section 91-7-151 (Rev. 2018), Dr. Hughes failed to probate his claim against Tom's estate within ninety days. The Defendants further argued that even if no estate proceeding had occurred, Dr. Hughes was still required to file a notice of his claim against Tom's estate within three years and ninety days of Tom's death, according to Mississippi Code Annotated section 91-7-91 (Supp. 2019).

¶19. The chancellor set the matter for a bench trial on the merits, at which time the chancellor also heard arguments on motions filed by the parties. As to the Defendants' motion for partial summary judgment, the chancellor stated that he would hold that ruling in abeyance and take it under advisement.

¶20. At the trial, the chancellor heard testimony from the following: Dr. Hughes; Dave; Harvey Huffstatler, who sold fish to Dave so that he could stock the lake; Mike Menninger, who purchased a lot in the Rose Hill development but asked Dave to buy it back because the lot lacked water and utilities; Michael Laborde, the water operator and field manager of the

7

Central Yazoo Water Association; and Lance Vandevender, an owner of a lot at Rose Lake.

¶21.  Dr. Hughes submitted numerous documents into evidence, including the $100,000 check to Tom; the $33,000 check to Dave; the written agreement between Tom and Dr. Hughes; Dr. Hughes's list of proposals; a July 14, 2015 certified letter from Dr. Hughes to Dave and Sandy requesting them to respond to his list of proposals; and text messages between Dr. Hughes and Dave.

¶22.  At trial, Dr. Hughes testified that at the March 4, 2015 meeting at the Islander Oyster House, the Defendants ratified his original agreement with Tom.  Dave, however, testified that no such ratification occurred, and he asserted that Dr. Hughes's checks were payments into an investment—not a contract for the sale of land.  Dave explained that his understanding of the agreement between his father (Tom) and Dr. Hughes was that if the Rose Lake development "did well, Dr. Hughes would do well, also" and that he would then receive lots in the development.  However, Dave explained that "[i]f the development did not do well, [Dr. Hughes] would not benefit."

¶23.  Dave testified that the development could not be completed and was therefore ultimately unsuccessful.  Dave explained that due to issues with the water lines, the water association would not install water meters in Rose Lake.  As a result, he could not sell any of the lots.  The chancellor asked Dave if he offered to pay to upgrade the water lines so that water meters could be installed, and Dave responded, "No, sir.  Our intent was to use the existing water line to provide six house lines with water . . . .[, a]nd then once we provided

8

those six, we would therefore pursue other options of adding on and spending money for water to upgrade the water lines."

¶24. Michael Laborde testified that the health department informed him that it could not install any more water meters in Rose Lake until the water line was upgraded. Michael stated that Dave was responsible for paying for the upgrade to the water line.

¶25. Lance Vandevender testified that in 2010, Dave told him that "he had a doctor friend that purchased some lots on the west side of the lake." Lance testified that Dave also told him that Dr. Hughes did not have a contract for the sale of the lots and "did not have a leg to stand on."

¶26. At the conclusion of Dr. Hughes's presentation of evidence, the Defendants made a motion for a Rule 41(b) involuntary dismissal. In support of the motion, counsel for the Defendants argued that Dr. Hughes failed to provide notice of his claim for $100,000 against Tom's estate within the statute of limitations. The Defendants also argued that Dr. Hughes's claim regarding the check for $33,000 fails under the statute of limitations and the statute of frauds because no written agreement for the sale of land existed.

¶27. As to whether Dr. Hughes constituted a creditor of Tom's estate who should have received notice of Tom's death and the probate proceedings of his estate, counsel for the Defendants asserted that the record was unclear as to Dr. Hughes's legal status at the time of Tom's death. Counsel explained, "I think the testimony was that there was an anticipatory agreement, but not a finalized agreement." Counsel for the Defendants stated that he "[did

9

not] believe that [Dr. Hughes] was provided a direct notice" of Tom's death.

¶28. The Defendants acknowledged that an exception to the statute of frauds exists—detrimental reliance/unjust enrichment—but the Defendants argued that after the March 4, 2015 meeting at the Islander Oyster House, no action was taken in reliance upon any agreement.

¶29. In response to the Defendants' motion to dismiss, counsel for Dr. Hughes argued that the text messages between Dave and Dr. Hughes, which were admitted into evidence as Exhibit 6, constitute evidence of the ratification as well as "something that the doctor relied upon to his detriment." Dr. Hughes maintained that because the Defendants ratified the July 21, 2004 written agreement between Dr. Hughes and Tom, the Defendants are liable to Dr. Hughes for the entire $133,000. Counsel also asserted that Dave's testimony that Dr. Hughes "remains an owner" in the development also goes toward the ratification of the agreement. Counsel for Dr. Hughes further argued that Dr. Hughes filed his complaint within three years of the March 2015 meeting at the Islander Oyster House.

¶30. Counsel for Dr. Hughes then made an oral motion pursuant to Mississippi Rule of Civil Procedure 15(b) and requested that the chancellor amend the pleadings to conform with the text message evidence. The chancellor responded, "So granted."

¶31. The chancellor made his ruling from the bench and granted the Defendants' Rule 41(b) motion for involuntary dismissal. The chancellor stated that he "[did] not find that there was ever a meeting of the minds [between Tom and Dr. Hughes] up to the standard of

10

being able to be orally ratified by the parties" at the March 4, 2015 meeting at the Islander Oyster House. The chancellor observed that "[c]onversely, it appears that various and sundry proposals were set forth at that meeting in complete inconsistence with a ratification of a previous meeting of the minds by Dr. Hughes and the deceased, Tom Shipp." The chancellor therefore held that without any ratification of the July 21, 2004 written agreement, Dr. Hughes's claim "cannot survive any analysis based upon any reading of any statute of limitations that might apply as to the $33,000; in all likelihood at best a three-year statute of limitation as it relates to the $100,000 to [Tom]." The chancellor further held that "[a]ny statute of limitations that could possibly apply . . . has long since passed."[4]

¶32. The chancellor noted, however, that with regard to the $133,000 paid by Dr. Hughes to Tom and the Defendants,

> Dr. Hughes has received no benefit related to those monies. In fact, this Court, after hearing significant testimony and evidence, sees that there we have a very inequitable situation to say the least as it appears before this Court. It appears that Mr. Shipp now lives in a nice pretty shiny new house, with fish that he basically stole, on land that it appears potentially Mr. Hughes had quite a bit of impact on providing that lifestyle. Inequitable to say the least, it appears based upon the presentations here over the last day and a half.

¶33. On September 13, 2018, the chancellor entered his order granting the Defendants' Rule 41(b) motion for dismissal, explaining that the "bench opinion is incorporated herein

---

[4] Mississippi Code Annotated section 15-1-49 (Rev. 2019) sets forth that "[a]ll actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." The supreme court has held that this statute "applies to claims of fraud, misrepresentation, . . . unjust enrichment, . . . and breach of contract." *Anderson v. LaVere*, 136 So. 3d 404, 411 (¶32) (Miss. 2014).

by reference[.]"

¶34.    On September 18, 2018, Hughes filed a motion to alter or amend the judgment by way of reconsideration.  After a hearing on the matter, the chancellor entered an order denying Hughes's motion on October 24, 2018.  On November 13, 2018, Hughes filed his notice of appeal from the chancellor's Rule 41(b) order of dismissal and the chancellor's order denying his motion to alter or amend the judgment.

## DISCUSSION

¶35.    Dr. Hughes argues that the chancellor erred in granting the Defendants' Rule 41(b) dismissal.  Dr. Hughes asserts that he and Tom entered into a written agreement on July 21, 2004, stating that Dr. Hughes would pay $100,000 toward the development of Rose Lake and that in return for the payment, Dr. Hughes would receive two lots in the development "upon completion" of the development.  Dr. Hughes acknowledges that Tom died three months later, but Dr. Hughes argues that at the March 4, 2015 meeting at the Islander Oyster House, the Defendants orally ratified the agreement between Tom and Dr. Hughes.  Dr. Hughes asserts that pursuant to this ratification, the Defendants became parties to the July 21, 2004 written agreement.  Dr. Hughes claims that because the Defendants then failed to complete the development of Rose Lake, they breached the agreement.  Dr. Hughes maintains that as a result of that breach, he is entitled to damages.

¶36.    However, the Defendants maintain that the July 21, 2004 written agreement did not constitute a contract because it failed to contain material terms that were sufficiently definite.

12

The Defendants specifically claim that (1) the agreement failed to set forth a time frame for performance of the agreement; (2) the agreement lacks any reasonably certain description as to which lots would be conveyed to Dr. Hughes if the agreement were enforced; (3) and the agreement lacks a definition of what constitutes "completion" of the development. The Defendants argue that even if the written agreement was considered to be a contract, no oral ratification of the written agreement occurred at the Islander Oyster House. The Defendants therefore assert that Dr. Hughes's claim for breach of contract fails. The Defendants further argue that Dr. Hughes's claim is barred by the statute of limitations and the statute of frauds.

¶37. Rule 41(b) allows the defendant to move for an involuntary dismissal on the ground that the plaintiff has not shown that he has any right to relief. Rule 41(b) states in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

M.R.C.P. 41(b). Here, Dr. Hughes asserts that the chancellor erred in dismissing his complaint because Dr. Hughes met his burden of proving a case for rescission, detrimental reliance, and unjust enrichment. Dr. Hughes states that the evidence at trial shows that the Defendants orally ratified the July 21, 2004 written agreement between Dr. Hughes and Tom.

¶38. In considering a Rule 41(b) motion to dismiss, "the [trial] judge must consider the evidence fairly, rather than in the light most favorable to the plaintiff. . . ." *Dissolution of*

13

*Marriage of Lewis v. Lewis*, 269 So. 3d 230, 235 (¶14) (Miss. Ct. App. 2018) (quoting

*Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992)).  Stated

differently, "the trial judge should give the plaintiff's evidence only 'such weight and

credibility as he would ascribe to it if he were making findings of fact and rendering final

judgment.'" *Id*. (quoting *Gray v. Alumax Extrusions Inc*., 477 So. 2d 1355, 1356-57 (Miss.

1985)).  The judge should dismiss the case if he "'would find for the defendant' on the

evidence presented[.]" *Id*. (quoting *Corson*, 612 So. 2d at 369).  If the plaintiff "has failed

to prove one or more essential elements of his claim or if the quality of the proof offered is

insufficient to sustain the plaintiff's burden of proof[,]" then the judge should grant the

motion to dismiss.  *Id*. (quoting *Buelow v. Glidewell*, 757 So. 2d 216, 220 (¶12) (Miss.

2000)).  However, "[t]he court must deny a motion to dismiss only if the judge would be

obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the

case." *Id*. (emphasis omitted) (quoting *Corson*, 612 So. 2d at 369).

¶39.    When reviewing a trial judge's decision to grant or deny a Rule 41(b) motion to

dismiss, we apply "the substantial evidence/manifest error" standard.  *Lewis*, 269 So. 3d at

236 (¶15).  "The trial judge's 'decision on the motion is, for purposes of appeal, treated like

any other finding of fact. In other words, his decision will not be disturbed on appeal unless

it was manifestly wrong.'" *Id*. (quoting *Gray*, 477 So. 2d at 1357).

¶40.    In reviewing the chancellor's decision granting the Defendants' Rule 41(b) motion,

we must examine whether Dr. Hughes met his burden of proving his claim for breach of

14

contract.

###### I.      Breach of Contract Claim

¶41.    "A breach-of-contract case has two elements: (1) 'the existence of a valid and binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enters. of Miss. LLC*, 250 So. 3d 402, 414 (¶43) (Miss. 2018) (quoting *Bus. Commc'ns Inc. v. Banks*, 90 So. 3d 1221, 1224 (¶10) (Miss. 2012)).  We must review the record and determine whether Dr. Hughes proved "the existence of a valid and binding contract."  *Id*.

###### A.      Whether the July 21, 2004 written agreement constituted a valid, binding contract.

¶42.    We recognize that "[t]he elements of a valid contract are: (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, (6) no legal prohibition precluding contract formation." *Woodruff v. Thames*, 143 So. 3d 546, 554 (¶19) (Miss. 2014) (quoting *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003)).  "A contract is unenforceable if the material terms are not sufficiently definite."  *Id*.

¶43.    We acknowledge that "[t]he existence of a contract is a question of fact that is to be determined by a jury, or a trial judge when a trial is conducted without a jury." *Bert Allen Toyota Inc. v. Grasz*, 909 So. 2d 763, 768 (¶12) (Miss. Ct. App. 2005) (citing *Hunt v. Coker*, 741 So. 2d 1011, 1014 (¶6) (Miss. Ct. App. 1999) (citing 75A Am. Jur. 2d *Trial* § 791 (1991))).

¶44.    As to the element that the agreement must be sufficiently definite, the supreme court

15

has stated with regard to the sale of land that "[t]he description of the land in a contract for the sale of real property is unquestionably an essential term that must be stated with specificity." *Woodruff*, 143 So. 3d at 554 (¶19) (citations omitted). The supreme court has held that "generally, a description is sufficient if a surveyor can locate the boundaries by following the description[,]" and "a description may still be considered sufficient, though it contains inaccuracies, if the property could be located with some certainty." *Swartzfager v. Saul*, 213 So. 3d 55, 63 (¶22) (Miss. 2017).

¶45. In *Swartzfager*, the supreme court affirmed the chancellor's finding that the land in the writing at issue was "sufficiently described" where the appellant wrote a letter to the appellee "identified the selected land as 'six acres of land of the twelve acres belonging to me in the Grandview subdivision on the Sharon Moss Road in the Second Judicial District of Jones County, Mississippi.'" *Id*. The supreme court explained that such writing "identified half of a twelve-acre parcel, within a specific subdivision, in a specific judicial district of Jones County." *Id*. In the letter, the appellant "then asked [the appellee] to pick which half of the twelve-acre parcel he wanted." *Id*. The supreme court found that the appellee then complied a picked which parcel he wanted, explaining that "[the appellee] mapped the northern half along the adjacent neighbor's property line. He also included several roads and noticeable boundaries, as well at the map's orientation." *Id*. As a result, the supreme court found that "[the appellant] had no misunderstanding about the chosen land. And this description is more than sufficient for a surveyor to locate the property's

16

boundaries." *Id*.

¶46.    In the present case, the written agreement between Tom and Dr. Hughes describes the property as follows "two (2) lots of approximately four (4) acres each on a lake to be constructed on what is locally known as Rose Hill Plantation, Bentonia, Mississippi." The written agreement provides that "[Dr.] Hughes shall have his choice of lots on the West side of the aforementioned lake upon completion." The written agreement fails to set forth a sufficient description of the land that would allow the property to "be located with some certainty," much less allow the boundaries to be located by a surveyor by following the description. *Id.* Further, the testimony at trial shows that the west side of the lake still has not been surveyed and that no lots have been demarcated. We recognize that the supreme court has held that "while courts may supply reasonable terms which the parties omitted in the contracting process, such as a time for performance, essential terms . . . cannot be left as open-ended questions in contracts which anticipate some future agreement." *Intrepid Inc. v. Bennett*, 176 So. 3d 775, 778 (¶10) (Miss. 2015). We therefore find that the written agreement fails to sufficiently describe the land to be conveyed.

¶47.    Additionally, we find that the written agreement before us is not "sufficiently definite." The agreement contains no definition as to what constitutes "completion" of the development and also fails to contain any time frame for the performance of the contract. At trial, Dr. Hughes agreed that the written agreement did not contain any terms as to expenditures on the development or how Dr. Hughes's money would be spent. Dr. Hughes

also admitted that the written agreement did not contain a provision regarding what would occur if the development was not completed and "did not perform as all wished it would."

¶48. Finally, we find that the element of mutual assent is also lacking from the written agreement.[5] As stated, the chancellor in this case ruled that no sufficient meeting of the minds occurred between Dr. Hughes and Tom in 2004 that could later be ratified by the Defendants at the Islander Oyster House. Dr. Hughes testified at trial that the July 21, 2004 written agreement was in anticipation of an agreement that would be finalized later. The transcript also reflects that Dr. Hughes stated that his intent for inviting Dave and Sandy to meet him at the Islander Oyster House on March 4, 2015, was "[t]o bring some finalization of the contract agreement with Tom Shipp to some finality that was appropriate for all." During cross-examination, Dr. Hughes also agreed that the written agreement between himself and Tom did not contain any terms as to expenditures on the development or how Dr. Hughes's money would be spent. Dr. Hughes again admitted that at the time of the March 4, 2015 meeting at the Islander Oyster House, no final agreement regarding to the development existed:

> [Counsel for the Defendants]: So at the point that you met with Mr. Dave Shipp and Ms. Sandy Shipp in 2015, there was not a final agreement regarding this development?

---

[5] Regarding the element of mutual assent, we recognize that "[t]o have a valid contract, there must be a meeting of the minds of the parties." *King Metal Bldgs. Inc. v. Renasant Ins. Inc.*, 159 So. 3d 567, 573 (¶20) (Miss. Ct. App. 2014) (citing *Nunley v. Merrill*, 513 So. 2d 582, 586 (Miss. 1987)).

[Dr. Hughes]:                         To my satisfaction, that is correct.

¶49.    After our review, we find that the July 21, 2004 written agreement fails to constitute a valid, binding contract.[6]

## B. Statute of Frauds

¶50.    Interestingly, the record reflects that in the proceedings below, counsel for Dr. Hughes admitted that the July 21, 2004 written agreement is "void." At the hearing on the Defendants' motion for partial summary judgment, counsel for Dr. Hughes admitted: "As we argued months ago, your Honor, that [July 21, 2004] contract does not withstand scrutiny under the statute of frauds. We can't enforce it trying to get property." Counsel for Dr. Hughes again admitted to the chancellor that the July 21, 2004 written agreement "is void on the statute of frauds."

¶51.    The statute of frauds requires that a contract for the sale of land "be in writing." Miss. Code Ann. § 15-3-1(b) (Rev. 2019). The July 21, 2004 agreement between Dr. Hughes and Tom was indeed in writing. However, as stated, the supreme court has expressed that "[t]he description of the land in a contract for the sale of real property is unquestionably an essential term that must be stated with specificity." *Woodruff*, 143 So. 3d at 554 (¶19) (citations omitted). A lack of written description of the land for sale "would render the contract

---

[6] *See Vice v. Hinton*, 811 So. 2d 335, 339 (¶15) (Miss. Ct. App. 2001) ("Since this Court determines that there was never a meeting of the minds which created a binding contract for the sale of the land and the house, there is no need to further discuss the issue relative to the [s]tatute of [f]rauds.").

unenforceable under the [s]tatute of [f]rauds." *Id*. at 555 (¶22). Because the written agreement in this case fails to sufficiently describe the land to be conveyed, it is therefore unenforceable under the statute of frauds.

¶52. Dr. Hughes argues that in addition to the written agreement, he and Tom also had an oral agreement regarding the vision for the development of Rose Lake. At the hearing on the Defendants' motion for partial summary judgment, Dr. Hughes argued that because the written agreement fails under the statute of frauds, it then became an oral agreement. The chancellor asked Dr. Hughes if he was now referring to the written agreement as an oral agreement. Dr. Hughes answered affirmatively. The chancellor then asked, "What is that oral agreement?" Dr. Hughes responded, "[The] [o]ral agreement is to take $100,000 in return for deeding two lots on this development, Rose Hill Lake development, to Dr. Hughes."[7]

¶53. We have already stated that contracts for the sale of land must be in writing. Accordingly, any oral agreement for the sale of land falls within the statute of frauds and is unenforceable. *Dew v. Langford*, 666 So. 2d 739, 743 (Miss. 1995) ("[T]he trial court was correct in its declaration that the oral agreement [concerning the sale of land] fell within the statute of frauds and was, accordingly, unenforceable.").[8]

---

[7] We recognize "that neither part performance of an oral contract with respect to the sale of land nor the expenditure of money in reliance upon it are sufficient to take it out of the [s]tatute of [f]rauds." *Reid v. Horne*, 187 So. 2d 316, 318 (Miss. 1966).

[8] However, the supreme court has allowed parol evidence to be admitted for "the sole purpose" of "apply[ing] the written description to a particular tract of land" or "to show the

20

¶54. After our review, we find that Dr. Hughes failed to prove the existence of a valid, binding contract. Dr. Hughes therefore failed to meet his burden of proving his claim for breach of contract.

## II. Ratification by the Defendants

¶55. After finding that a valid contract did not exist between Dr. Hughes and Tom, we therefore turn next to examine if the Defendants could still orally ratify the July 21, 2004 written agreement and thereby become parties to the agreement. The written agreement was between Tom and Dr. Hughes, and we recognize that "[a] contract cannot bind a nonparty." *Colyer v. First United Methodist Church of New Albany*, 214 So. 3d 1084, 1088 (¶18) (Miss. Ct. App. 2016). However, "[r]atification of the unauthorized contract of another affecting one's own interest breathes life into it back to and from its inception, and makes the one ratifying it a party thereto."[9] *Gulf Ref. Co. v. Travis*, 201 Miss. 336, 382, 30 So. 2d 398, 400

locality of the land contracted to be sold." *Calmes v. Weill*, 243 So. 2d 408, 409 (Miss. 1971); *Holmes v. Evans*, 48 Miss. 247, 252 (1873). The supreme court has stated that parol evidence can only be used "where the memorandum refers to something extrinsic, by which the land may be located and identified by means of parol proof." *Holmes*, 48 Miss. at 252; *accord Calmes*, 242 So. 2d at 409. Parol evidence cannot take away or add anything to the written description of the land. *Calmes*, 242 So. 2d at 409. In *Calmes*, the supreme court found that a tax sale was void where the tax deed failed to contain a description that was sufficient to identify the parcel of land to be conveyed and where the parol evidence also failed to identify the particular tract of land. *Calmes*, 242 So. 2d at 409-10. Dr. Hughes's testimony regarding his oral agreement with Tom provides no evidence as to the locality of the land; rather, Dr. Hughes essentially just restates what is already written in the agreement.

[9] The record reflects that in the proceedings below, Dr. Hughes argued that "parties can ratify a contract as void. If the statute of limitations has run, fine. You can ratify the contract, put life back in it." Dr. Hughes also asserted that even if the written agreement is void, "you have a right to get your money back." Dr. Hughes further asserted that because

21

(1947) (*Gulf Refining II*), *on suggestion of error from Gulf Ref. Co. v. Travis*, 201 Miss. 336, 29 So. 2d 100 (1947) (*Gulf Refining I*).

¶56.    Dr. Hughes argues that the evidence presented at trial, when read in conjunction with the discussion between the parties at the March 4, 2015 meeting at the Islander Oyster House, shows that the Defendants orally ratified the July 21, 2004 written agreement and agreed to enforce it.[10]   In his appellate brief, Dr. Hughes specifically argues that the Defendants "recognized the contract in 2008 by accepting a check, through ongoing communications between 2008 and 2015, and, most importantly, by his testimony during trial.   The Defendants therefore validated the agreement with [Dr. Hughes]."   Dr. Hughes also asserts that the July 25, 2014 text he received from Dave demonstrates that Dave was taking steps to fulfill his part of the contract:

> Dr. Hughes:   When can we get together next week for an update on [Rose Lake]?

"the first contract is oral, the ratification doesn't have to be in writing . . . and could be [] ratified orally."

[10] Dr. Hughes asserts that under Mississippi Rule of Civil Procedure 15(b), the pleadings were amended to conform with Dave's trial testimony that allegedly ratified the original agreement.  The record shows that the chancellor granted Dr. Hughes's Rule 15(b) motion to amend the pleadings to conform with the evidence.  As a result, Dr. Hughes argues that the evidence, when read in conjunction with the discussion between Dr. Hughes and the Defendants at the Islander Oyster House, shows ratification of the original agreement.  Dr. Hughes explains that the July 25, 2014 text from Dave promising Dr. Hughes that he was in the process of having engineers plat out more lots demonstrates that Dave was taking steps to fulfill his part of the contract, therefore ratifying the original agreement.  Dr. Hughes also states that at trial Dave testified that Dr. Hughes continues to possess an ownership interest in Rose Lake.  Dr. Hughes submits that such testimony shows that Dave recognized and ratified the original agreement.

22

Dave:    Hey, doc I got your voicemail last weekend. I will first thing next week get the engineers to plat out those lots. I'll call you first thing next week and we will discuss progress. Hope all is well!

Dr. Hughes maintains that because the Defendants ratified the original agreement and then breached that agreement by failing to complete the development of Rose Lake, he is entitled to recover damages based on unjust enrichment.

¶57. However, the Defendants argue that they did not ratify the written agreement between Dr. Hughes and Tom because the agreement did not constitute a contract that could later be ratified. The Defendants further maintain that no ratification occurred at the meeting at the Islander Oyster House, and they cite to Dr. Hughes's trial testimony, where he stated that the purpose of that meeting was "[t]o bring some finalization of the contract agreement with [Tom] to some finality," but he admitted that the parties did not reach an agreement.

¶58. The Defendants also argue that "a contract to purchase land is within the purview of the statute of frauds, and any modification of a contract that comes under the statute of frauds must be in writing." *Favre Prop. Mgmt. LLC v. Cinque Bambini*, 863 So. 2d 1037, 1045 (¶21) (Miss. Ct. App. 2004) (citing Miss. Code Ann. § 15-3-1(c)); *Canizaro v. Mobile Commc'ns Corp. of Am.*, 655 So. 2d 25, 29 (Miss. 1995)). However, we recognize that ratification of a contract and modification of a contract are two different actions. Although "[r]atification is a technical term peculiar to the law of agency," we recognize that the term is "sometimes loosely used in other connections." *Gulf Refining Co. II*, 201 Miss. at 381, 30 So. 2d at 399. Regarding ratification, the supreme court has held:

23

One may adopt or acquiesce in a contract affecting his property made by another who acted when making it in his own behalf and in his own right by an express or implied agreement so to do with the other party to the contract, but the result thereof is not the ratification of the original contract.

*Id.* at 382, 30 So. 2d at 400. As stated above, the supreme court explained that such "[r]atification of the unauthorized contract of another affecting one's own interest breathes life into it back to and from its inception, and makes the one ratifying it a party thereto." *Id*.

¶59. The supreme court has also expressed that "[r]atification is a matter of intention, [and] its existence is a question of fact[.]" *Id*. at 381, 30 So. 2d at 399. We recognize that "[r]atification may be established through affirmative acts or inaction." *Barnes, Broom, Dallas & McLeod PLLC v. Estate of Cappaert*, 991 So. 2d 1209, 1212 (¶11) (Miss. 2008); *see also Gulf Refining II*, 201 Miss. at 381, 30 So. 2d at 399 ("[I]n order that there be a ratification there must be a voluntary assumption of the unauthorized act either on full information or on less than full information if undertaken deliberately in disregard of the fact that all knowledge of the transaction available has not been obtained."). The supreme court has clarified that "[a] person ratifies an act by (a) manifesting assent that the act shall affect that person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 797 (¶14) (Miss. 2011). The supreme court has acknowledged that "under some circumstances, a principal's inaction can result in ratification, but only where the principal has notice that others will infer from his silence that he intends to manifest his assent to the act." *Id*.

¶60. In *Gulf Refining Co. I,* 201 Miss. at 368, 29 So. 2d at 103, the appellant, Gulf Refining

24

Company, entered into a ten-year mineral lease with the appellee's father. The appellee, Travis, was not a party to the mineral lease. *Id*. The mineral lease included land owned by Travis, and the supreme court found that Travis's father lacked authority to include the land in the lease. *Id*. On appeal, Gulf Refining Company argued that by endorsing his father's name on the checks he received under the mineral lease, Travis essentially ratified the unauthorized lease of his land. *Id*. On appeal, the supreme court held that no ratification of the lease occurred. *Id*. at 372, 29 So. 2d at 105.

¶61.    After the supreme court issued its decision, the appellant filed a "suggestion of error" as to the supreme court's ruling. *Gulf Refining Co. II*, 201 Miss. at 380, 30 So. 2d at 399. On suggestion of error, Gulf Refining argued that the facts showed that Travis ratified the lease "by his conduct in accepting and retaining delay rentals thereunder after knowledge of facts and circumstances from which he knew or should have known that same were being paid under claim of ownership of such lease for the purpose of continuing it in full force and effect." *Id*.

¶62.    However, the supreme court observed that "[t]he appellant makes no claim that there is any written instrument, or writing of any character in this evidence, that complies with [the statute of frauds]." *Id*. at 384, 401. The supreme court reviewed the documents that existed regarding the lease, and the supreme court agreed that the documents "obviously do not comply with the requirements" of the statute of frauds as to the written memorandum of the sale of land, or the lease of land for more than one year. *Id*. The  supreme court further

25

explained that "In order to comply with this section[,] the memorandum must contain words appropriate to, and indicating an intention thereby, to convey or lease land, must identify the land, set forth the purchase price, or, if a lease, the rent to be paid, and the terms of payment."

*Id*. The supreme court ultimately ruled:

> [T]he appellee's knowledge vel non [(or not)] of the fact that his land was included in the lease executed by his father to [Gulf Refining Company] when he cashed the rental checks issued to his father therefor is of no value here in the absence of the written instrument required by the statute of frauds.

*Id*. The supreme court therefore held that because the lease did not comply with the statute of frauds, no ratification of the lease occurred. *Id*. at 384-85, 401.

¶63. In the present case, no valid contract existed for the Defendants to later ratify. Furthermore, even if a valid contract did exist, the Defendants' actions (and inactions) failed to constitute ratification of such contract. Our review of the testimony and evidence presented at trial shows that Dr. Hughes testified that after he wrote Dave the check for $33,000 on May 29, 2008, he met with Dave "[m]aybe every six to eight months or so." Dr. Hughes admitted that during those meetings, Dave "never said anything about [Dr. Hughes's] ownership" in the Rose Lake development, and Dr. Hughes did not initiate any conversation regarding his ownership in Rose Lake until the March 4, 2015 meeting at the Islander Oyster House. Dr. Hughes explained that he did not specifically ask Dave or Sandy about his ownership in Rose Lake because he believed that "the relationship [he] had with Tom carried on through Dave[, and] . . . I just assumed that it was a proper consideration of the way things would eventually work out as we finalized the contract."

26

¶64. Dr. Hughes also testified that during the March 4, 2015 meeting, he asked Dave and Sandy: "What is your consideration of bringing finality to the relationship that I had with Tom concerning the agreement in the contract to grant some finalization on my behalf?" According to Dr. Hughes, Dave and Sandy responded, "Yes, we agree something should be accomplished." Dr. Hughes testified that Dave asked Sandy what they owed on the property, and Sandy responded "$50,000." Dr. Hughes stated that

> at that point, I gave them some considerations that I said were strictly considerations that were things that they could think about, ponder, that would be starting points for bringing some finality. I said, These are suggestions. Please note that they are just suggestions. Please get back with me after you read them, think about them, whatever. And I put a cut off of about three months on it.

Dr. Hughes explained that he provided the proposals to Dave and Sandy "[t]o try to get things moving to bring some finality to it. To keep our dialogue going so that we could sit down and talk with each other in a proper way to bring some resolution."

¶65. Dr. Hughes stated that during the meeting, he felt that Dave and Sandy exhibited "a positive response that they had an obligation." He admitted that they did not use the word "obligation" but that "Sandy may have said we need to do something, and . . . Dave nodded." When asked by his counsel to clarify what Sandy meant she and Dave need to do something about, Dr. Hughes answered, "About the agreement, making me whole on the agreement that I had with the original documentation and communication with Tom[.]" Dr. Hughes explained "So I took it from that that there was an understanding [that] it was an obligation." However, Dr. Hughes admitted that during the meeting, "[w]e didn't reach an agreement, but

27

I took it that we could go ahead and proceed and carry out some communication that would bring some finality[,]" meaning to restore Dr. Hughes's investment of $133,000.

¶66. Dr. Hughes further testified that after the March 4, 2015 meeting, he did not hear back from Dave or Sandy regarding the proposals. Dr. Hughes explained he tried to get in touch with them several times, but he was unsuccessful. Dr. Hughes finally sent a certified letter to the Defendants on July 14, 2015, which was admitted into evidence at trial. In the letter, Dr. Hughes stated that "[the Rose Lake] investment was made between Tom and me and I continue to trust that you will honor his wishes. As those who have now inherited this responsibility I request that you fulfill this obligation in a proper way." Dr. Hughes informed the Defendants that he sent the letter "because I have called your cell and left messages with no response." Dr. Hughes requested that the Defendants send him "a list of your proposed considerations [regarding Dr. Hughes's investment] for me by the end of the day on Friday July 24, 2015" and asked the Defendants "to fulfill your responsibility." Dr. Hughes testified that the Defendants never responded to the letter. Dr. Hughes filed his complaint on September 13, 2017.

¶67. Dr. Hughes admitted that at the time of the meeting at the Islander Oyster House, no final agreement regarding to the development existed. During cross-examination, counsel for the Defendants asked Dr. Hughes whether after the March 4, 2015 meeting he and Dave or Sandy signed a written document or agreement regarding Rose Lake, and Dr. Hughes admitted they did not.

28

¶68.    Dave testified that at the time Dr. Hughes wrote him the $33,000 check, he knew that Dr. Hughes "had an agreement with my dad" and that Dr. Hughes gave Tom some money. Dave testified that "[his] take on Dr. Hughes's role with the lake was that . . . he gave us some money to in turn when the lake project was complete and profiting, he would in turn get his lots. That was my interpretation of Dr. Hughes's investment." Dave further clarified that "I'm saying that if the development did well, Dr. Hughes would do well, also. If the development did not do well, he would not benefit." Dave testified that per his understanding of the agreement, Dr. Hughes did not actually purchase any lots. Dave testified that he did not have a written contract with Dr. Hughes, but he did have written, signed contracts with the people who did buy lots in the development.

¶69.    Dave agreed that Dr. Hughes had a $133,000 investment in Rose Lake but that because the development was a failure, Dr. Hughes lost his investment. Dave testified that because the water association would not supply water to the lots in the development, he could not sell any house lots. As a result, the development was a failure and Rose Lake was dissolved in 2016.

¶70.    As to the March 4, 2015 meeting at the Islander Oyster House, Dave testified that he did not tell Dr. Hughes that he lost his investment because "[w]e didn't really talk about Rose Lake Development very much." According to Dave, the three instead talked about Dr. Hughes's endeavors. Dave testified that "at the end of the meeting, he gave us a manila envelope and said, Look at this when y'all leave. Don't look at it now. And we will be in

29

conversation later." Dave testified that he read Dr. Hughes's proposals, but he never discussed them with Dr. Hughes "[b]ecause it felt like he was trying to get something that wasn't a part of the agreement. . . . It seemed as though he didn't understand the agreement."

¶71. After our review, we find that because the written agreement did not constitute a valid contract under the statute of frauds, no subsequent ratification of the agreement could occur. We further find that even if the written agreement was a valid contract, the testimony and evidence presented at trial fail to show any ratification of the written agreement by the Defendants. Dr. Hughes failed to meet his burden of proving his claim for breach of contract.

### III. Damages

#### A. Rescission, Detrimental Reliance, and Unjust Enrichment

¶72. We have determined that the chancellor correctly found that no valid contract existed and no ratification by the Defendants occurred, and therefore Dr. Hughes failed to meet his burden of proving his claim for breach of contract. We now turn to examine whether Dr. Hughes is still entitled to recover any damages. Dr. Hughes argues he is entitled to recover $133,000 in damages based on the theories of rescission, detrimental reliance, and unjust enrichment. Dr. Hughes also specifies that he is seeking restitution, and not specific performance, of the agreement.

¶73. The Defendants argue, however, that Dr. Hughes failed to file his complaint within the three-year statute of limitations for breach of contract claims. Mississippi Code

Annotated section 15-1-49 (Rev. 2019) sets forth that "[a]ll actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." The supreme court has held that this statute "applies to claims of fraud, misrepresentation, . . . unjust enrichment, . . . and breach of contract." *Anderson*, 136 So. 3d at 411 (¶32). The written agreement was entered into on July 21, 2004, and Tom died on October 21, 2004. Dr. Hughes filed his complaint against the Defendants on September 13, 2017. The Defendants maintain that as a result, Dr. Hughes's claims are barred.

¶74. However, Dr. Hughes asserts that because the Defendants ratified the written agreement on March 4, 2015, at the meeting at the Islander Oyster House, the statute of limitations does not apply. Dr. Hughes argues that he filed his complaint within three years of the March 4, 2015 meeting. Dr. Hughes also asserts that detrimental reliance and equitable estoppel create an exception to the statute of limitations and statute of frauds, thus allowing him to recover damages.

¶75. As to the $33,000 check Dr. Hughes paid to Dave on May 29, 2008 (which Dr. Hughes testified was to be used to develop more lots and, in return, Dr. Hughes would have a third lot in the development assigned to him), the Defendants argue that Dr. Hughes's claim as to the $33,000 is barred by the statute of limitations because Dr. Hughes wrote the check on May 29, 2008, nearly a decade before he filed his suit. Section 15-1-49 provides that the three-year statute of limitations for a breach of contract claim "begins to run when the cause

31

of action accrues[.]" *Anderson*, 136 So. 3d at 411 (¶33). The supreme court has explained that a "cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." *Id*. "In a breach of contract claim, the cause of action accrues at the time of the breach." *Culpepper Enters. Inc. v. Parker*, 270 So. 3d 116, 126 (¶28) (Miss. Ct. App. 2018).

¶76. Dr. Hughes testified that in October 2014, he realized that the Defendants "probably" would not develop the west side of the development. Counsel for Dr. Hughes asked him, "During the time you spent with Dave Shipp and Sandy Shipp on or about October 13, 2014, on through when you saw Dave's house, was there any discussion among the three of you about the progress of developing [Rose Lake]?" Dr. Hughes answered, "Only to the extent that we fellowshipped the west side. And I was left with the impression that that probably was not going to be developed. That was my impression after visiting with him." However, from our review of the record, it appears that Dr. Hughes first realized that the Defendants had no intention in completing the entire development in July 2015, after the Defendants failed to respond to the certified letter he sent them on July 14, 2015. Therefore, as to any claims that Dr. Hughes may have against the Defendants, we find that Dr. Hughes filed his complaint within the three-year statute of limitations.

¶77. The Defendants also argue that Dr. Hughes failed to follow the procedure set forth by Mississippi Code Annotated section 91-7-221 (Rev. 2018), which provides a mechanism to ask a decedent's estate to recognize a contract. Additionally, the Defendants maintain that

32

Dr. Hughes failed to pursue a monetary claim against Tom's estate within ninety days of the estate's first notice to creditors. *See* Miss. Code Ann. § 91-7-151 (Rev. 2018).[11] The Defendants assert that even if no estate proceeding had occurred, Dr. Hughes was still required to file a notice of his claim against Tom's estate within three years and ninety days of Tom's death, which Dr. Hughes failed to do.

¶78. In response, Dr. Hughes argues that he is not seeking land or money from Tom's estate; rather, he is seeking a judgment in rescission and unjust enrichment from the Defendants. Dr. Hughes asserts that after Tom's estate was closed, the Defendants ratified and agreed to enforce the July 21, 2004 written agreement and therefore the Defendants are personally liable. Dr. Hughes maintains that as a result, Tom's estate is irrelevant.

¶79. Dr. Hughes executed the written agreement with Tom on July 21, 2004. Tom died on October 21, 2004. A glaring issue before this Court is the fact that at no point during these proceedings has Dr. Hughes filed a claim against Tom's estate. In his complaint, Dr. Hughes states that "[b]ased on Tom Shipp's written representation . . . that he was going to develop said gated community, on July 21, 2004, [Dr. Hughes] delivered Tom Shipp a check in the

---

[11] Section 91-7-151 states that "[a]ll claims against the estate of deceased persons, whether due or not, shall be registered, probated and allowed in the court in which the letters testamentary or of administration were granted within ninety (90) days after the first publication of notice to creditors to present their claim. Otherwise, the same shall be barred and a suit shall not be maintained thereon in any court[.]" The record reflects that Dr. Hughes did not receive notice by the Defendants of Tom's death. At trial, counsel for the Defendants stated that it was unclear whether Dr. Hughes held the status of a creditor of Tom's estate. Counsel for the Defendants maintained that the $100,000 constituted an "investment" and "is not recoverable" from Tom's estate.

33

amount of $100,000.00 in order to participate in the joint venture to develop said community." The agreement was between Dr. Hughes and Tom, yet Dr. Hughes filed his complaint for breach of contract against Dave, Sandy, and Rose Lake. As we have stated, "[a] contract cannot bind a nonparty." *Colyer*, 214 So. 3d at 1088 (¶18).

¶80. Mississippi Code Annotated section 91-7-221 states as follows:

> If any person sell lands, enter into contract to make title, and die before the title be made, then the person to whom the title was to be made, his heirs or assigns, may petition the court which granted the letters on the estate of the vendor, for an order on the executor or administrator to make title agreeably to the contract. After the parties interested have been cited by summons or by publication, the court shall hear the petition and evidence, and may decree that the executor or administrator make title according to the contract.

This statute provides a procedure allowing persons seeking to ask a decedent's estate to recognize a contract. Additionally, Mississippi Code Annotated section 15-1-55 states that "[i]f a person . . . liable to any such action, shall die before the expiration of the time herein limited therefor, such action may be commenced . . . against the executor or administrator of the deceased person, after the expiration of said time, and within one year after the death of such person." At trial, Dr. Hughes admitted that after learning about Tom's death, he made no inquiry as to whether there was any estate proceeding and he did not file a claim against Tom's estate.

¶81. Dr. Hughes then appears to assert in his complaint that because Sandy was Tom's sole beneficiary and "inherited all real property, along with fixtures and improvements, which would constitute the development in issue[,]" she therefore became a party to the July 21,

34

2004 written agreement between Tom and Dr. Hughes. However, this Court has found no valid ratification by the Defendants of the written agreement.

¶82.    As to any agreement that existed between Dr. Hughes and the Defendants, Dr. Hughes asserted in his complaint that after Tom's death, the Defendants requested that Dr. Hughes pay them $33,000 "to develop more lots on the north end of the lake." Dr. Hughes claimed that "[i]n return for the additional $33,000.00 investment, [Dr. Hughes] was going to have another, third, lot in the development assigned to him." Dr. Hughes wrote a check to the Defendants on May 29, 2008. Dr. Hughes filed his claim for breach of contract against the Defendants on September 13, 2017, and sought recovery of the $33,000 (in addition to the $100,000) that he paid to the Defendants.

¶83.    However, we have stated that to prevail on a claim for breach of contract, Dr. Hughes must prove the existence of a valid contract. Neither party argues that the payment of $33,000 in exchange for a third lot constitutes a separate contract between Dr. Hughes and the Defendants. Dr. Hughes adamantly asserts throughout the proceedings that the agreement was between himself and Tom, and the Defendants only became parties to that agreement after ratifying it. The pleadings show that Dr. Hughes viewed the $33,000 he paid to the Defendants as additional investment towards the development. Dr. Hughes specifically stated in the complaint that after Tom's death the Defendants requested that Dr. Hughes pay them $33,000 "to develop more lots on the north end of the lake." Dr. Hughes claimed that "[i]n return for the additional $33,000.00 investment, [Dr. Hughes] was going to have

35

another, third, lot in the development assigned to him."

¶84.    We next turn to examine whether Dr. Hughes is entitled to recover any damages against the Defendants regarding the $33,000.  Dr. Hughes asserts that he is entitled to recover damages under the theories of rescission, detrimental reliance, and unjust enrichment. We recognize that "rescission presupposes the existence of a valid contract." *Thrash v. Countrywide Com. Real Estate Fin. Inc*., 405 F. App'x 816, 820 (5th Cir. 2010) (unpublished).  Because no valid contract existed in the present case, "the remedy of rescission is unavailable to [Dr. Hughes]." *Id*.

¶85.    We next recognize that "'[d]etrimental reliance' is an element of both promissory estoppel and equitable estoppel." *Noble v. Wellington Assocs. Inc*., 145 So. 3d 714, 721 (¶34) (Miss. Ct. App. 2013).  This Court has explained the difference between promissory estoppel and equitable estoppel as follows:

> Promissory estoppel legally enforces a promise made without consideration—so no contract was formed—because three things happened: (1) the promise was made with the intent it would be relied upon; (2) the promise was indeed relied upon; and (3) it would be unjust not to enforce the promise.  Equitable estoppel enforces an otherwise unenforceable contract because one party has received a benefit under the contract, and it would be unjust to allow that party to avoid the contract's obligations due to some issue with the contract's enforcement.

*Id*. at 721-22 (¶34) (citation omitted).  Because no contract existed, we look to promissory estoppel and unjust enrichment to determine if this vehicle provides a means of recovery for Dr. Hughes as to the $33,000.

¶86.    Unjust enrichment and promissory estoppel provide methods of recovery where no

36

contract exists. "An unjust[-]enrichment action is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Avakian v. Wilmington Tr. Nat'l Ass'n*, 242 So. 3d 961, 971 (¶33) (Miss. Ct. App. 2018). The supreme court has held that "[u]njust enrichment only applies to situations where there is no legal contract and 'the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another.'" *Powell v. Campbell*, 912 So. 2d 978, 982 (¶14) (Miss. 2005). We recognize that "[t]he basis for an action for 'unjust enrichment' lies in a promise, which is implied in law, that one will pay to the person entitled thereto that which in equity and good conscience is his." *SKL Invs. Inc. v. Hardin*, 170 So. 3d 588, 591 (¶13) (Miss. Ct. App. 2014). Furthermore, with regard to parties seeking recovery for contracts falling under the statute of frauds, the supreme court has stated that

> where an action may not be maintained on an oral contract as being within the statute of frauds, or for damages resulting from a breach of such contract, the general rule is that the party breaking the contract will not be permitted to obtain benefits from it to his unjust enrichment. The statute of frauds may not be used to permit one relying on it to enrich himself at the expense of another or to aid in defrauding such other person.

*McKellar's Estate v. Brown*, 404 So. 2d 550, 553 (Miss. 1981).

¶87. At the hearing on the Defendants' pre-trial motion to dismiss, the Defendants asserted that Dr. Hughes failed to plead unjust enrichment in the complaint. In response, Dr. Hughes argued, "I talked about rescission. Rescission is the same thing as unjust enrichment. If I need to amend the complaint, I can." The record does not reflect any ruling by the chancellor

37

as to this issue. Our review of the record shows that Dr. Hughes did not plead unjust enrichment as a theory of recovery in his complaint. *See Hans v. Hans*, 482 So. 2d 1117, 1122 (Miss. 1986) ("The question of unjust enrichment was not mentioned in the pleadings and is presented here for the first time."). "[I]t is a rule of almost universal application that questions of whatever nature not raised in the trial court and preserved for review will not be noticed on appeal." *Id*.

¶88. Although it was not raised in the pleadings, the record before us shows that Dr. Hughes presented his argument that he was entitled to recovery based on unjust enrichment at the hearing on the pretrial motion to dismiss and also at trial. Additionally, as stated, during arguments on the Defendants' Rule 41(b) motion to dismiss, Dr. Hughes made an oral motion pursuant to Mississippi Rule of Civil Procedure 15(b) requesting that the chancellor amend the pleadings to conform with the text message evidence, which the chancellor granted. Rule 15(b) provides that

> [w]hen issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

M.R.C.P. 15(b). We will therefore address Dr. Hughes's argument regarding unjust enrichment.

¶89. To succeed on his claim for recovery under both unjust enrichment and promissory estoppel, Dr. Hughes must "identify a promise." *Leal v. Univ. of S. Miss.*, 296 So. 3d 660,

38

667-68 (¶29) (Miss. 2020).  Dr. Hughes asserts that under Rule 15(b), the pleadings were amended to conform with the July 25, 2014 text message from Dave promising Dr. Hughes that he was in the process of having engineers plat out more lots.  Dr. Hughes also states that this text message conversation showed that Dave was taking steps to fulfill his part of the contract.  As stated above, the text message conversation on July 25, 2014, reflects the following exchange:

> Dr. Hughes: When can we get together next week for an update on [Rose Lake]?
>
> Dave: Hey, doc I got your voicemail last weekend.  I will first thing next week get the engineers to plat out those lots.  I'll call you first thing next week and we will discuss progress.  Hope all is well!

¶90.    The record also reflects that on the "for" line of the $33,000 check to Dave, Dr. Hughes wrote "Investment lot (total 3)."  At trial, counsel for Dr. Hughes asked him, "You said with the $33,000, there was another lot added. Please explain what you meant."  Dr. Hughes answered, "My assumption was that the project would be finalized in the vision that Tom had outlined, with a gated community, excellent in every way.  And so I asked for another lot that could be on the east side that would be mine."

¶91.    Dave testified that Dr. Hughes did not receive an additional lot in return for the $33,000 payment.  Instead, Dave maintained that as a result of paying $33,000, Dr. Hughes then had a $133,000 investment in Rose Lake.  Dave testified that he "spent [the $33,000 check] in development funds.  It was numerous things that took place as far as the

development." During Dave's testimony, the chancellor also asked Dave about whether the $33,000 payment was made in return for the promise of the conveyance of an additional lot to Dr. Hughes:

[CHANCELLOR]: What was your understanding of what that subject line meant? Investment Lot, Total Three.

[DAVE]: My understanding was that if the east side were to do well, that probably where they would go, unless we made good money and moved to the west side.

[CHANCELLOR]: I don't know what you just said. What is your understanding, if any?

[DAVE]: I didn't have a very clear understanding of what that "For' line meant.

[COUNSEL]: So you don't have any understanding of lots or potential lots that Mr. Hughes had purchased for an investment?

[DAVE]: I mean, in my interpretation of that is we would probably give him lots on the east side.

[CHANCELLOR]: Then why haven't you?

[DAVE]: We can't get water.

[CHANCELLOR]: You are in development, right? So a lot isn't water; a lot is a lot. So I'm just wondering, if that is your understanding, why haven't you given him three lots?

[DAVE]: Because if we gave him lots without the availability of the water, I don't –

[CHANCELLOR]: It is his investment. I guess it wouldn't be a very good investment.

[DAVE]: No.

40

[CHANCELLOR]: If you buy a bunch of stock in WorldCom, it's a bad investment. But you get the stock certificates. You still actually get it.

[DAVE]: My interpretation of the agreement was that when the development prospered, he would prosper, also.

[CHANCELLOR]: Again, I thought –

[DAVE]: There wasn't a lot purchased.

[CHANCELLOR]: I thought you said that your understanding was that he would get lots on the east side maybe?

[DAVE]: Once the development started selling lots, yes.

¶92. After hearing the arguments and reviewing the evidence, the chancellor granted the Defendants' Rule 41(b) motion for involuntary dismissal on the ground that Dr. Hughes failed to show any right to relief. Based on our review of the testimony and evidence presented, we find that Dr. Hughes failed to meet his burden of proving that the Defendants promised to convey him a third lot in the development in exchange for the payment of $33,000. We therefore find that the chancellor did not err by failing to award Dr. Hughes damages based on the theories of rescission, detrimental reliance, or unjust enrichment.

### B. Punitive Damages

¶93. Finally, Dr. Hughes argues that he made a prima facie case showing that he is entitled to an award of punitive damages from the Defendants. "To qualify for punitive damages in a breach of contract case, a plaintiff must prove by a preponderance that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard

of the plaintiff's rights." *Hamilton v. Hopkins*, 834 So. 2d 695, 703 (¶26) (Miss. 2003).

¶94. After our extensive analysis above, we find that Dr. Hughes failed to meet his burden of proving by a preponderance of the evidence that the Defendants acted maliciously or in reckless disregard of Dr. Hughes's rights in failing to complete the development. As a result, we find that the chancellor did not err in denying Dr. Hughes's request for punitive damages.

¶95. **AFFIRMED.**

**GREENLEE AND LAWRENCE, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; WESTBROOKS, J., JOINS IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶96. I agree that we must affirm the chancery court's dismissal regarding the physician's demand for property because the Statute of Frauds bars an attempt to enforce such a deal when it is not reduced to writing. I also agree the doctor simply waited too long to pursue a bare refund of the money he had given (or invested) for the development of Rose Hill. Yet I do not think that the nature of equity is as limited as the majority—or the trial court—concludes.

¶97. It is well established that "if there is no adequate remedy at law, equity will step in." *Tolbert v. Southgate Timber Co.*, 943 So. 2d 90, 99 (¶31) (Miss. Ct. App. 2006). Likewise, "[e]quity will not suffer a wrong without a remedy . . . ." *Emmons v. Emmons*, 217 Miss.

42

594, 600, 64 So. 2d 753, 755 (1953); *see also White v. White*, No. 2018-CA-00544-COA, 2019 WL 7876654, at \*5-8 (¶¶ 33-44) (Miss. Ct. App. May 21, 2019) (recognizing that equity can provide relief even when the Statute of Frauds bars enforcement of an unwritten contract for land), *cert. dismissed*, 291 So. 3d 1111 (Miss. 2020).

¶98. The trial court ruled from the Bench that the defendant "now lives in a nice pretty shiny new house, with fish that he basically stole, on land that it appears potentially [Dr.] Hughes had quite a bit of impact on providing[.]" This is unquestionably true, since it was not contested that Dr. Hughes provided $133,000 toward that unjust enrichment—with the $33,000 going to stocking the lake with fish. The trial court determined that "any statute of limitations that could possibly apply" would have run.

¶99. Yet the return of the money was not the only relief the doctor sought. In his amended complaint, the doctor asked for multiple types of damages for how the Shipps treated him. After all, he had invested a massive sum of money and received exactly nothing for his trouble. So he set the nature of his compensatory damages at $133,000—the amount he had lost—and then sought "consequential damages, punitive damages, pre-judgment interest, and post-judgment interest."

¶100. A claim in general for these damages should not be barred by the statute of limitations because the Shipp family continued to string Dr. Hughes along at their meeting at an oyster house. The physician testified that on March 4, 2015, he asked them to visit with him "[t]o bring some finalization of the contract agreement with Tom Shipp to some finality that was

43

appropriate for all." Dr. Hughes testified that "their response was, 'Yes, we agree something should be accomplished,'" while "one spoke it and the other one nodded." Ultimately, the physician believed the family would "[r]estore me from what my investment was."

¶101. Of course the Shipps did not. It is this meeting—held in 2015, around two and a half years before Dr. Hughes filed suit—where our focus should be, not the payments to the Shipp family in 2004 and 2008. At the meeting, it was clear that the family continued to lead on their old friend with the understanding that he would be made whole. It is clear he believed it too. But after that meeting at the oyster house, the Shipps avoided him, even when he drove an hour just to drop by and try to visit. It appears that after the family told him he would be restored, they never spoke to him again.

¶102. So it is from that time period that we should look to whether Dr. Hughes has a claim, and the Supreme Court has determined that the catchall three-year statute of limitations applies to claims for unjust enrichment. *Anderson v. LaVere*, 136 So. 3d 404, 411 (¶33) (Miss. 2014). "[T]he three-year statute of limitations begins to run when the cause of action accrues," and that is "when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." *Id*. (footnote and internal quotation mark omitted). Given that allowance of time, Dr. Hughes' testimony about the meeting at the oyster house should allow the suit to proceed past the involuntary dismissal stage.

¶103. Furthermore, equity provides a way for Dr. Hughes to possibly recoup the six figures he has paid the Shipp family. In one recent case, a mother had sued her son over his refusal

to transfer land to her after she took over payments for him on a promissory note, and sought to force him to transfer the property to her. *White*, 2019 WL 7876654, at *1 (¶2). Because the land deal was not reduced to writing, the Statute of Frauds barred that type of recovery. *Id*. at *2-3 (¶¶11-17).

¶104. Yet this did not strand the mother without a remedy; she had asked for the imposition of constructive trust, "a judicially imposed remedy used to prevent unjust enrichment when one party wrongfully retains title to property." *Id*. at *3 (¶20). The trial court had found the claim was unavailable. *Id*. (quoting *Tolbert* and *Emmons* as to the broad powers of equity, the majority reversed and remanded for a determination if a constructive trust was applicable under the facts of the case). *Id*. at *5 (¶33). While the plaintiff in this case did not seek that particular remedy, the general point remains that equity can provide a route of relief when the Statute of Frauds otherwise bars recovery.

¶105. "Inequitable at the least," stated the chancellor from the bench. I agree, and because equity will not suffer wrong without a remedy, I respectfully concur in part and dissent in part.

**McDONALD, J., JOINS THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**